484 F.2d 692
 73-2 USTC P 9636
 AVCO DELTA CORPORATION CANADA LTD., Plaintiff,
v.
UNITED STATES of America et al., Defendants,
Natural Gas Pipeline Company of America et al., Third Party Defendants.
ALBERT & HARLOW, INC., a/k/a Albert Equipment, Inc., et al.,
Counter-defendants-Appellants,
v.
UNITED STATES of America, and Canadian Parkhill Pipe
Stringing, Inc., et al., Defendants-Appellees.
UNITED STATES of America et al., Defendant-Appellant,
v.
WOLF BATTERY & ELECTRIC, INC., et al.,
Counterdefendants-Appellees, Canadian Parkhill
Pipe Stringing, Inc., a/k/a Parkhill
Pipe Stringing, Inc., et al.,
Cross-Defendants-Appellees.
 No. 72-1428 and 72-1899.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 18, 1973.
Decided Aug. 1, 1973.
 
 Robert C. Strodel, Peoria, Ill., (Arthur R. Kingery, Peoria, Ill., of counsel), John Scripp, James D. Wing, Milwaukee, Wis., for Albert & Harlow.
 Jackson P. Newlin, Peoria, Ill., for Clifford Rygh.
 John G. Satter, Jr., Pontiac, Ill., for Wolf Battery & Electric.
 Frank O. Wetmore, II, and Edward J. Wendrow, Chicago, Ill., for Canadian Parkhill Pipe Stringing.
 Scott P. Crampton, Asst. Atty. Gen., Jack Teplitz, Atty., Tax Div., Dept. of Justice, Washington, D. C., Donald B. Mackay, U. S. Atty., Springfield, Ill., for U. S. A.
 Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 These appeals involve various claimants to two funds presently held in custodia legis by the district court.[1]
 
 
 2
 * One fund originally consisted of $216,337.44 which was deposited with the court by Natural Gas Pipeline Company of America (Natural), a third party defendant in the suit, under a counterclaim of interpleader under 28 U.S.C. Sec. 1335. The funds had been retained pursuant to the provisions of a construction contract between Natural and Canadian Parkhill Pipe Stringing, Inc., a/k/a Parkhill Pipeline, Inc. (Parkhill, Inc.), a defendant in the initial suit and now a counterdefendant. The pertinent provisions of the construction contract concerning this retainage are as follows:
 
 120 Invoicing and Payment
 
 3
 .1 . . . .
 
 
 4
 .3 Each invoice shall be paid by the Company [Natural] to Contractor [Parkhill] on or before the tenth (10th) office day of Company following receipt of such invoice at Company's Chicago office, subject, however, to the following:
 
 
 5
 .31 Company shall retain ten (10%) per cent of all invoices (hereinafter referred to as "retainage"), except invoices for extra work, and such retainage shall be paid to Contractor:
 
 
 6
 .311 After Contractor has been notified by Company in writing that all work to be done under this Contract is completed to Company's satisfaction; and
 
 
 7
 .312 After Contractor has furnished Company with an affidavit (on Company's Form E/C 22), signed by Contractor, stating that all bills, claims and charges for materials, labor, supplies, equipment and services incurred by Contractor in connection with said work have been fully paid and receipts or other proper evidence of such payment are in the possession of Contractor and that Contractor has fully paid and satisfied all liability for contributions, payroll and payroll taxes, use tax or other forms of taxes, fees, licenses, excises or payments, required by Federal and state legislation and local ordinances, and has fully complied with all requirements thereunder, as to all persons employed and property and material furnished in the performance of said work; and
 
 
 8
 .313 . . . .
 
 
 9
 .314 With respect to Contracts wherein the total contract price is $25,000.00 or more, after a reasonable period has elapsed subsequent to the expiration of all time periods, fixed by the laws of the State in which said work is performed, within which liens may be filed against the property of the Company . . . .
 
 
 10
 .32 The final invoice shall be paid by Company to Contractor only after the requirements of Sub-Parts .311 and .312 have been satisfied.
 
 
 11
 .33 Company may withhold from any invoice, retainage or other payment due, any amount which in its judgment is necessary to secure Company against any and all claims asserted against Company or Contractor and payable by Contractor, and for any claim of Company against Contractor, whether such claim is liquidated or unliquidated and whether or not such claim arises by reason of the operations of Contractor hereunder or from operations of Contractor independent of this Contract. When any such claim becomes liquidated, Company may, at its option, apply in settlement of such claim any amounts up to the total amounts withheld under this Sub-Part .33. In such event, if the remaining balance of such amounts withheld shall exceed the amount applied by Company to settle claims pursuant hereto, such excess shall be paid by Company to Contractor; and if the amount paid by Company in settlement of claims pursuant hereto shall exceed the total amounts withheld, Contractor shall pay the difference to Company.[2]
 
 
 12
 Natural alleged that Parkhill, Inc., had failed to furnish the affidavit required by the above portions of the contract and had otherwise failed to demonstrate that all of the above mentioned liabilities had been satisfied.
 
 
 13
 Natural named as counterdefendant Parkhill, Inc., which claimed to be entitled to the entire amount, the United States, which had filed federal tax liens against Parkhill, Inc.,[3] and a multitude of other potential claimants who were creditors of Parkhill, Inc., most of whom could be classed as either laborers, materialmen, or subcontractors. Natural itself also claimed the right to set-off from the retainage in the amount of $11,423.33, which right arises under subparagraph .33 of Part 120 of the construction contract set out above. Finally, Natural alleged that Great American Insurance Company of New York, which Parkhill, Inc., had obtained as surety on a Labor and Material Payment Bond, "has refused and failed to perform its obligations under said bond."
 
 
 14
 Of the various counterdefendants who filed claims to the retainage, aside from Parkhill, Inc., and the United States, we need consider only six. Albert Equipment Co., formerly known as Albert & Harlow, Inc., filed a claim for $25,304.14. Service Parts Supply Co. claimed $23,579.33 and alleged that it had filed a lien under the Illinois Oil and Gas Lien Act, Ill.Rev.Stat. 1971, ch. 82, Sec. 78. Standard Service & Supply Co. filed a claim for $11,845.76 and also alleged that it had complied with the Illinois Oil and Gas Lien Act. Both Service Parts and Standard Service & Supply cross-claimed against the surety, Great American Insurance Company of America (Great American). After the claimants answered interrogatories propounded by counsel for Parkhill, Inc., Parkhill moved for summary judgment against the above three claimants on the ground that in fact none of them had properly perfected any lien rights against the pipeline property of Natural in accordance with the applicable Illinois lien laws. The district court on February 25, 1972, dismissed the above three claimants from the case, although it at the same time granted default judgments in the amounts of their crossclaims against Parkhill. They have appealed in cause No. 72-1428. None of the other claimants dismissed by that order have appealed.
 
 
 15
 Wolf-Jacobson, Inc., filed a claim for $759.80 arising from a judgment it had obtained against Parkhill, Inc., on March 25, 1970, with garnishment proceedings against Natural, as garnishee, begun on March 30, 1970. Wolf Battery & Electric Service, Inc. (the two will jointly be referred to hereinafter as "Wolf") also claimed $977.79 under a March 25, 1970, judgment against Parkhill, Inc., and a March 30, 1970, garnishment against Natural. Finally, Clifford Rygh, et al., Trustees of Central Laborers Pensions Fund (Laborers), filed a claim for $23,616 based on a garnishment suit in the state court against Parkhill, Inc., with Natural as a garnishee defendant, instituted April 6, 1970, but not having reached judgment. The district court in a memorandum decision held that Wolf's claims "are exactly the type of claim from which the Retainage was intended to shield Natural, and further that Natural could have rightfully paid these claims under the contract."
 
 
 16
 Apparently on the rationale that Parkhill, Inc., could not have acquired a property interest in that portion of the retainage and that the Government's tax lien therefore could not have attached, Wolf's judgments were ordered paid in full from the retainage. As to the Laborers' claim, the court held that "by joining Natural as garnishee in their suit they have attained a position substantially the same as that of the two Wolf companies, and therefore they should recover on the same theory." The district court further allowed Laborers reasonable attorney's fees under Ill.Rev.Stat. 1971, ch. 13, Sec. 13. The Government appeals in cause No. 72-1899 from this order.
 
 
 17
 As we understand the district court's theory of the case it is that Wolf and Laborers were properly claimants directly against the retainage because they had obtained liens against that fund; that the United States had obtained rights in the fund through Parkhill, Inc.; and that although Albert & Harlow, Standard Service, and Service Parts Supply were now judgment creditors of Parkhill, Inc., based on the default judgment entered at the time the court dismissed their claims against the interpleaded fund, their rights were necessarily inferior to those of the United States under its prior tax lien which would consume all of the rest of the retainage, thus meriting dismissal of their claims against the interpleaded funds. For the reasons hereinafter given we reverse these holdings.
 
 
 18
 If the Government is correct that Parkhill, Inc., has the sole property right in the retainage (less the set-off paid to Natural by order of the district court on August 22, 1972), then the issue would be one solely of lien priority. The law is quite clear that as to questions of priority of liens in the tax field federal law controls. United States v. Security Trust & Savings Bank, 340 U. S. 47, 49, 71 S.Ct. 111, 95 L.Ed. 53 (1950). Thus, in Security Trust the Court held that a federal tax lien had priority over an attachment lien recorded prior to the Government's lien but in which judgment was obtained only after the Government's lien was filed. A similar result was reached in United States v. City of New Britain, 347 U.S. 81, 84, 74 S.Ct. 367, 369, 98 L.Ed. 520 (1954), where it was held that in order to defeat a federal tax lien a prior lien valid under state law must be choate, that is, "when the identity of the lienor, the property subject to the lien, and the amount of the lien are established." Only when the lien provided for by state law became choate would the Court apply the maxim "the first in time is the first in right."
 
 
 19
 Security Trust was followed in United States v. Acri, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264 (1955), to defeat an Ohio attachment lien deemed "an execution in advance" by the state courts, and in United States v. Liverpool & London & Globe Insurance Co., Ltd., 348 U.S. 215, 75 S.Ct. 247, 99 L.Ed. 268 (1955), to defeat a prior Texas garnishment lien where judgment was not obtained until after the federal tax lien had been filed. More recently, the Court in United States v. Pioneer American Insurance Co., 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed. 2d 770 (1963), gave priority to a federal tax lien against a mortgagee's claim for reasonable attorney's fees awarded in prosecuting a foreclosure suit where the federal tax lien was recorded after the institution of the foreclosure suit but prior to the entry of the judgment determining the amount of the attorney's fee, the decision being based on the theory that the amount not being specifically known, the attorney's fee lien was not choate. Thus, the Government argues that, its tax lien having been filed prior in time to any of the other claimants having obtained a choate lien, it should have absolute priority over all the claimants.[4]
 
 
 20
 The cited authorities are well established but they do not decide the case before us as the Supreme Court has also clearly held that state law governs the question of whether a party as "property or rights to property" to which a lien, whether the Government's or that of a private party, can attach. Thus, in Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960), the Court remanded a case to the New York Court of Appeals for it to consider whether, under New York law, funds held by the owner due to the general contractor constituted "trust funds" for the benefit of subcontractors, laborers, and materialmen so that the general contractor who had defaulted on his federal taxes as well as on his payments to the subcontractors had no "property" or "rights to property" in the fund (at least until all of the laborers, materialmen, and subcontractors had been paid) to which the Government's tax lien could attach.[5]
 
 
 21
 At the same time, the Court affirmed the Fourth Circuit's holding that North Carolina law gave the general contractor no property interest in the amount due under the general construction contract, except to the extent that such amount exceeded the aggregate of all amounts due to subcontractors. Therefore, the Government could recover only so much of the construction price as would remain unpaid after deduction of a sum sufficient to pay the subcontractors, United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960). It should be noted that the money due the general contractor in Durham Lumber was not withheld especially for the purpose of protecting the owner against liens or to protect subcontractors, but had been withheld because of a dispute over the amount due.
 
 
 22
 We are in a situation not unlike that found in United States v. Chapman, 281 F.2d 862 (10th Cir. 1960). There a telephone company had withheld funds from the general contractor as authorized by the construction contract, which gave it the right to require proof of payment of all materialmen before acceptance of the work. When, after the work on the project had been completed, the general contractor defaulted on both his payments to the subcontractors and his federal taxes, the telephone company brought an interpleader action to determine the rights to the fund. The court cited Aquilino to the effect that state law controlled on the issue of whether the general contractor, Sims, had any property right in the retainage to which the Government's tax lien could attach. The court held:
 
 
 23
 "That right does not exist because of the failure to pay the labor and material claims. . . . This accords to the general rule, recognized in Oklahoma, that contracts must be performed according to their terms before recovery can be had thereon. As the contractor-taxpayer had no enforceable right to the money covered by the retained percentage, there was no property or right to property to which the tax lien of the United States attached, except to the extent that the retained percentage exceeded the labor and material claims." 281 F.2d at 866-867 (footnotes omitted).
 
 
 24
 In response, the Government contended that, since under Oklahoma law the materialmen could not place a lien on the telephone company's property and since they could not sue the telephone company because of lack of privity of contract, they should have no enforceable right to the fund. The court rejected the contention, stating that the Government was merely relying on the weakness of the competing title rather than on the strength of its own claim. "Right to recover from the fund must be based on the strength of a claimant's title and not on the weakness of the title of another claimant." 281 F.2d at 867 (footnote omitted). Further, the court went on to hold that under Oklahoma law the materialmen had the right to secure payment from the fund.
 
 
 25
 We turn then to the issue of (1) whether under Illinois law the United States has a claim to the fund through the rights of Parkhill, Inc., in that fund, and (2) whether under Illinois law the various labor and material claimants have rights in the fund superior to any held by Parkhill, Inc. Under both issues we reach the same result- that the Government and all materialmen and laborers not precluded by judgments which have become final are to share equally in the retainage fund.
 
 
 26
 Turning to the first issue-whether Parkhill, Inc., has a right to the retainage-we note the uncontested fact that Parkhill, Inc., has not complied (and apparently cannot comply) with the contract terms. No affidavit regarding payment of subcontractors has been filed. In the district court, Natural initially moved to dismiss the third party complaint filed against it on this very ground, that Parkhill's failure to comply with the terms of the contract terminated its rights. The court denied the motion:
 
 
 27
 "It seems apparent to this court that whether INC's [Parkhill, Inc.] rights under the contract terms have been terminated or not makes no real difference here. If such rights were held to be terminated on the facts of this case, INC would surely have a cause of action on the basis of quantum meruit, or some other equitable theory, for any balance of retainage over valid mechanic's or materialmen's liens, etc., or for the same amount as would be due INC under the express contract terms. Whether INC has a cause of action under the express terms of the contract or not, it does have a cause of action limited to any residue of the retainage which may remain after Natural has discharged its liability to others arising out of INC's breach. Thus, in the opinion of this court, INC does not have any rights against Natural to that part of the retainage which Natural may be obligated to pay to others because of INC's breach. It does have a cause of action for any residue, which is contingent upon their [sic] being a residue and upon the amount thereof."
 
 
 28
 In our opinion, Parkhill's claim to the retainage is not enhanced by a quantum meruit or similar theory. The law of Illinois appears to be that Parkhill's rights against Natural if predicated on such an equitable theory must nevertheless proceed on a "substantial performance" showing. "It was therefore held, and became the rule in Equity, that if the owner got substantially the thing for which he bargained, he must pay for it, but he was allowed a credit as compensation for the deficiencies existing in what he got as compared to what strict performance would have given him." Watson Lumber Co. v. Guennewig, 79 Ill. App.2d 377, 397, 226 N.E.2d 270, 280 (5th Dist. 1967).
 
 
 29
 An action in equity claiming substantial performance has as a measure of the recovery the contract price less "an amount necessary to account for the difference between what the owner got by the actual performance as compared to what he bargained for." Watson Lumber, supra. The Government and Parkhill, Inc., contend that Natural has not been damaged at all-that in fact the value of the actual performance was the same as that for which it had bargained-that is, it got a finished pipeline free of all liens. This theory has a facial appeal, but it neglects the fact that the construction contract indicates, in our reading thereof, that Natural desired to have its subcontractors paid regardless of whether or not the subcontractors could assert liens against Natural's property. The fact that an owner may wish to have his subcontractors paid where they have no lien rights was recognized in Board of Education of City of Chicago v. Chicago Bonding and Surety Co., 218 Ill.App. 20 (1st Dist. 1920), where the court held that a subcontractor suing in the name of a municipal corporation which could not be sued by the subcontractor could recover on the bond given by the contractor which had promised to pay for all labor and material used. This result was reached despite the surety's contention that since the bond was to indemnify the Board of Education, which had not been, and could not be, sued and thus had not suffered any damage from the contractor's default, there should be no recovery.
 
 
 30
 In discussing a similar contract provision, the Ninth Circuit in Cove Irrigation District v. American Surety Co. of New York, 42 F.2d 957, 960 (9th Cir. 1930), cert. denied, 282 U.S. 891, 51 S. Ct. 103, 75 L.Ed. 785, quoted from Builders' Lumber & Supply Co. v. Chicago Bonding & Surety Co., 167 Wis. 167, 166 N.W. 320, 321 (1918), in which the Supreme Court of Wisconsin said:
 
 
 31
 "If that was not deliberately intended for the benefit of third parties- for the benefit of materialmen and laborers-why was it inserted? It was already provided that the contractor should furnish the material and labor for the construction of the work. It was not necessary for the avoidance of mechanics' liens, because the property of a municipality is not subject thereto. It was not necessary to make the contractor personally liable to laborers and materialmen, because that liability would arise from the contracts of employment of laborers and purchase of materials. We cannot assume that this provision was introduced into the contract for its resounding effect or for an idle purpose. It is highly commendable on the part of municipalities to secure protection for those who render services and furnish materials in and about the construction of their public works. Indeed it is good business policy for them to do so. . . ." (Emphasis added.)
 
 
 32
 See also Harris v. American Surety Co. of New York, 372 Ill. 361, 24 N.E.2d 42 (1939).
 
 
 33
 However, the courts have not interpreted the rights and interests of third parties to be limited to contracts in which a public body was the owner and therefore lienproof. In Fidelity & Deposit Co. of Baltimore v. Rainer, 220 Ala. 262, 125 So. 55 (1929), the Alabama Supreme Court, on reconsideration, held that a materialman had a direct right of action on a bond to indemnify the owner in a private construction contract where the bond provided that the general contractor should pay for all labor and materials. The court stated:
 
 
 34
 "We are not impressed with that line of judicial decision which assumes that the owner, the promisee, has no concern for those whose labor and material enter into his building, other than mere protection of himself by way of indemnity. He may provide for them a remedy on the bond, to prevent their proceeding against him under the lien laws. He may want the bond to protect them as an assurance that labor and material will be procured and the work done without delay and confusion. He may require it simply as a just protection to those whose labor and material enter into his building." 125 So. at 59. (Emphasis added.)
 
 
 35
 Thus, it is clear that there are valid reasons for Natural's having bargained for Parkhill, Inc., to pay all laborers and materialmen, irrespective of whether there existed a possibility of liens against its property.
 
 
 36
 If we look at the words of the construction contract, we find support for the above view that Natural contemplated that either all claims arising from the project would be paid by Parkhill, Inc., or else the retainage found would be available for their payment. Subparagraph .312, besides requiring the affidavit that the contractor has paid all bills and claims for materials, labor, supplies, and equipment, also specifies that the contractor must have paid "contributions, payroll, and payroll taxes, use taxes or other forms of taxes, fees, licenses, excises or payments, required by Federal and state legislation . . .." As was agreed at oral argument, there was no way that the owner of the property (Natural) could have been liable for the failure of the contractor to pay federal payroll taxes. Unless subparagraph .312 is to be considered a meaningless piece of "boilerplate" in the construction contract, Natural bargained for payment of laborers and materialmen. We know of no reason for Natural not being entitled to performance of this provision of the contract as well as those pertaining to the construction of the pipeline.
 
 
 37
 In a legal sense, damage was suffered by Natural from the failure of Parkhill, Inc., to pay the subcontractors, materialmen, laborers, and taxes as it had agreed in the contract, i.e., there was not "substantial performance." It is difficult, if not impossible, to know how to measure such damages suffered by Natural. Suffice it to say that it would not be captious or ingenuous to say that the retainage was in one sense a liquidated damages clause since the measure of damages was so difficult to calculate in advance and the amount could not be deemed a penalty. In this sense, Natural's desire to pay the other claimants to the fund-expressed in its motion to dismiss the initial third party claim of Parkhill, Inc.-reflects a desire to use the retainage, or liquidated damages fund, to remedy as much of the actual damage as possible.
 
 
 38
 We conclude that Parkhill, Inc., and therefore the Government, has an absolute right to the retainage only insofar as it is not subject to the prior claims of others. We therefore turn to the validity of the claims of the various subcontractors, laborers, and materialmen who are parties to this appeal.[6]
 
 
 39
 Illinois law is clear that absent proper compliance with the provisions of the appropriate lien statute a subcontractor has no right of action against the owner of property. Vanderlaan v. Berry Constr. Co., 119 Ill.App.2d 142, 255 N.E.2d 615 (4th Dist. 1970). In Vanderlaan, the court refused to consider the type of argument accepted by the district court in Durham Lumber Co., supra, similar to a quasi-statutory right of the subcontractor against the owner who has notice of the contractor's default, even though the mechanics' lien statute specifically speaks in remedial terms. Ill.Rev.Stat.1971, ch. 82, Sec. 39. Further, the court in Hill Behan Lumber Co. v. Marchese, 1 Ill.App.3d 789, 275 N.E.2d 451 (2d Dist. 1971), rejected a similar argument and also held that the subcontractor was not "entitled to an equitable lien on the grounds of unjust enrichment." 275 N.E.2d at 453.
 
 
 40
 Although it is clear from the above that Illinois courts would not generally recognize a right of action against the owner of property by an unpaid subcontractor, absent compliance with a lien statute, this does not mean that the subcontractors, laborers, and materialmen have no rights in the present case. None of the cases cited by the Government or by Parkhill, Inc., dealt with claims by subcontractors to a retainage fund such as the one before us. As indicated above, it cannot be said that this fund was created solely for the protection of Natural. It covers claims for which Natural could not be held personally liable. In addition, if the retainage were solely for the purpose of protecting Natural from liens and any similar claims, then it would be superfluous since subparagraph .33 gives Natural complete discretion to withhold from any payments "any amount which in its judgment is necessary to secure Company against any and all claims asserted against Company or Contractor and payable by Contractor . . . ."
 
 
 41
 Since subparagraph .312 cannot be dismissed purely in terms of protection of Natural against liens, upon either of two alternative bases the subcontractors and creditors of Parkhill, Inc., specified in subparagraph .312 are entitled to recover. First, these creditors were the third party beneficiaries to the contract and therefore attained a direct right of action against the fund. Second, even if they had no contractual right in the fund, Illinois courts in the exercise of their equitable powers in a dispute between the contractor, suing in equity under the doctrine of substantial performance, and the creditors of the contractor, claiming equitable rights to the fund through Natural, would, in our opinion, prefer those creditors.
 
 
 42
 The law of third party beneficiaries has traveled a lengthy road since Bourne v. Mason, 86 Eng.Rep. 5, 1 Vent. 6 (1669, K.B.), in which the court gave judgment for the defendants in a suit by a creditor beneficiary on the ground that the plaintiff was "a stranger to the consideration," contra as to a donee beneficiary, Dutton v. Poole, 83 Eng.Rep. 523, 2 Lev. 210 (1677, K.B.). By the nineteenth century, the Exchequer had accepted such causes. In Robertson v. Wait, 155 Eng.Rep. 1360, 8 Ex. 299 (1853), Baron Parke upheld the right of a third party beneficiary to recover on a trust theory, in spite of the fact that the contract used no trust language nor contained any indication that the contract was for the benefit of the third party. The leading American case initially recognizing the rights of a third party beneficiary to sue on a promise was Lawrence v. Fox, 20 N.Y. 268 (1859), holding that the plaintiff who was the creditor of Holly could sue the defendant on the defendant's promise to Holly to pay plaintiff Holly's debt when the defendant borrowed a similar sum of money from Holly.
 
 
 43
 The rule in Illinois presently appears to be "that, if a contract be entered into for a direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct he may sue on the contract; if incidental he has no right of recovery thereon." Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 257, 178 N.E. 498, 501 (1931). To the same effect, Rhodes Pharmacal Co. v. Continental Can Co., 72 Ill.App.2d 362, 369, 219 N.E.2d 726 (1st Dist.1966).[7]
 
 
 44
 With these Illinois cases in mind, we turn to the present case in which the construction contract specifically withholds final payment until the general contractor provides an affidavit that all his bills have been paid. Initially, we should note that there is no problem with the fact that at the time of the signing of the construction contract the specific creditors of Parkhill, Inc., were not known. As Corbin stated: "Of course the beneficiary must be identified before he has an enforceable right; but it is not necessary that he should be identified or identifiable at the time the contract is made. It is enough that he be identified at the time performance is due." 4 Corbin on Contracts Sec. 781, at 70 (1951).
 
 
 45
 A materialman may be a third party beneficiary of a promise by a general contractor to obtain a surety bond for the prompt payment of all laborers and materialmen, and, in the context of a government contract, an unpaid materialman of a subcontractor was allowed to sue the general contractor who had failed to provide such a bond as he had covenanted in the construction contract. Strong v. American Fence Constr. Co., 245 N.Y. 48, 156 N.E. 92, 94 (1927) (opinion by Cardozo, C.J.): "Security to materialmen and laborers was the end and aim of the transaction. If the promise was not for them, it was without significance or reason." Nor does the promise have to be for the sole benefit of the third party who is suing as long as it was "for his direct or substantial benefit." Beck v. Reynolds Metals Co., 163 F.2d 870, 871 (7th Cir. 1947) (opinion by then Circuit Judge Minton, relying on Illinois cases).
 
 
 46
 Thus, we need to decide whether there was created a third-party beneficiary relationship for the materialmen, laborers, and other creditors so that they have rights under Illinois law, the creation flowing from the contract requirements that Parkhill, Inc., provide an affidavit of payment before receiving the retainage from Natural coupled with the provision that Natural could, if it so chose, pay any liquidated claims that arose out of the construction contract and charge Parkhill, Inc. Certainly the claimants are direct beneficiaries of the promise, and, although the promise may not have been solely for their benefit but also for the protection of Natural, it must have been substantially for their benefit since some of the specified creditors could not obtain liens against Natural's property, specifically, e. g., the Government's claim for taxes. As noted above, a similar analysis has been applied to cases involving materialmen attempting to recover on a contractor's bond on a government job. See Southwestern Portland Cement Co. v. Williams, 32 N.M. 68, 251 P. 380 (1926); Board of Education of City of Chicago v. Chicago Bonding and Surety Co., supra.
 
 
 47
 It would appear, therefore, that the various parties specified in subparagraph .312 do have a right to sue for their unpaid bills to the extent of the retainage fund available. Whatever funds that are still being retained by the owner of the property are subject to such a third-party beneficiary's suit. As Professor Corbin has stated, "they [courts] may well interpret a bond [or retainage] that is expressly conditioned on the payment of laborers and materialmen as being a promise to pay them and made for their benefit. The words reasonably permit it, and social policy approves it." 4 Corbin, supra Sec. 800, at 177-78. (Footnote omitted.)
 
 
 48
 However, in our opinion, even if the Illinois courts would not give the claimants a direct right to the retainage fund as third party beneficiaries, we would still reach the same result. Although the general right of a materialman or subcontractor to an equitable lien against the property of the owner if he has failed to perfect his statutory lien was rejected in Hill Behan Lumber Co. v. Marchese, supra, this does not mean that Illinois courts would refuse to impose an equitable lien on retainage funds such as we have in the present case. The entire thrust of the court's decision in Hill Behan Lumber was that since statutory liens are in derogation of the common law the claimant must strictly comply with all of the statutory prerequisites in order to obtain any rights. This does not reflect on whether or not equity would impose a trust on certain funds specifically retained under the construction contract by the owner in part to protect the materialmen, laborers, and subcontractors.
 
 
 49
 "The essential elements of equitable liens include (1) a debt, duty or obligation owing by one person to another . . . ., and (2) a res to which that obligation fastens, which can be identified or described with reasonable certainty." Marshall Savings & Loan Ass'n v. Chicago National Bank, 56 Ill. App.2d 372, 378, 206 N.E.2d 117, 120 (2d Dist. 1965). In the present case, we have both of the elements for an equitable lien. As we have seen above, there was a duty, created by the construction contract's own language in the subparagraphs relating to the retainage, which ran from Natural to the subcontractors, laborers, and materialmen. This duty, however, related only to the specific res to which it fastened-the retainage fund. It is in this way that the Hill Behan Lumber case is distinguishable, since in that case there was no specifically created contractual duty nor a specific res to which the duty attached.
 
 
 50
 Further, even if there were no specific contractual duty created by the contract, equity might well imply one insofar as the retainage fund was concerned. As the Eighth Circuit stated in Theatre Realty Co. v. Aronberg-Fried Co., Inc., 85 F.2d 383, 388 (8th Cir. 1936), Pomeroy [3 Pomeroy, Eq. Jr. (4th Ed.) Sec. 1239] notes that equitable liens may originate in express contracts, but
 
 
 51
 "the rule is not limited to specific agreements, for 'in addition to the general doctrine that equitable liens are created by executory contracts which in express terms stipulate that property shall be held, assigned, or transferred as security for the promisor's debt or other obligation, there are some further instances where equity raises similar liens without agreement therefor between the parties, based either upon general considerations of justice (ex aequo et bono) or upon the particular equitable principle that he who seeks the aid of equity in enforcing some claim must himself do equity."'
 
 
 52
 As the same circuit said in United States Fidelity & Guaranty Co. v. Sweeney, 80 F.2d 235, 238 (8th Cir. 1935), "Laborers and materialmen, however, have an equitable right to payment from funds due a contractor on a public improvement in preference to general creditors . . . . There is a recognized equitable right of unpaid furnishers of labor or materials to such part of the contract price as may remain in the possession of the government after the completion of the work by the contractor."
 
 
 53
 In any event, we are confident that if the Illinois courts had been confronted with the issue of priority of funds held as retainage, in part for the payment of subcontractors, laborers, and materialmen, an issue on which none of the parties has cited a controlling case, they would reach a similar conclusion. Justice clearly compels such a result, especially when we note that the general contractor, whose claim to the retainage fund in equity is by way of a claim of substantial performance, does not have clean hands relative to the claims of the unpaid subcontractors, materialmen, and laborers.
 
 
 54
 We draw support for this view from Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), in which the Supreme Court had to decide who had priority to a retainage fund such as we have here. The surety on the performance bond had paid all of the contractor's bills for labor and materials and sought to obtain the retainage fund as a partial reimbursement. The contractor's trustee in bankruptcy opposed the claim arguing that the surety was just another creditor and that the retainage fund was an asset of the bankruptcy estate. The Supreme Court held that the surety could recover as subrogee of the laborers and materialmen (see concurring opinion, 371 U.S. at 142, 83 S.Ct. 232):
 
 
 55
 "We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it." 371 U.S. at 141, 83 S.Ct. at 237. (Footnote omitted.)
 
 
 56
 Thus, the Court held the rights to the retainage fund of those taking through the rights of the materialmen (i. e., the surety) to be superior to those taking through the rights of the general contractor (i. e., the trustee in bankruptcy). Similarly, in American Surety Co. v. Westinghouse Electric Manufacturing Co., 296 U.S. 133, 55 S.Ct. 9, 80 L.Ed. 105 (1935), the Court held in reference to priority to a retainage fund on a Government contract that the materialmen had superior rights to those of the surety who was claiming as the subrogee of the general contractor.
 
 
 57
 In summary, we are of the opinion that, on this matter of first impression in Illinois, under either of the legally acceptable theories the Illinois courts would hold that those classes of creditors specifically identified in subparagraph .312 have rights to the retainage fund.[8] Thus, Parkhill, Inc.'s interest in the fund is limited to any residue after all valid claims properly before the court have been paid in full. Since most of the claimants have not appealed the district court's granting of summary judgment against them, such rights as they otherwise would have had may have been waived.[9] Insofar as the other claimants who are presently before us are concerned, including the United States, since federal withholding taxes are specifically mentioned in subparagraph .312, we interpret the contract as allowing them to share in a pro rata fashion to the amounts of their claims arising out of this particular construction project. Since, at oral argument, it was contended that some of the claims against Parkhill, Inc., are based on other construction projects, we remand to the district court to ascertain the facts and, if this is true, to reduce the claims by any such amount. Further, it is necessary for the district court to adjudicate the validity and the precise amount of the Government's tax claim before any pro rata distribution can be made. Parkhill has indicated that the amount is overstated and will be actively contested.
 
 
 58
 As we noted in the statement of this case, the district court in allowing the Laborers' claim also granted attorneys' fees of $4,275.00. Whether or not this allowance should be included in the initial sharing of the retainage is not an easily resolvable question. If the claim were derivable through Parkhill, then the statutory provision for attorneys' fees in suits for wages would indubitably be applicable. The claims, however, do not come through Parkhill. We have assumed, without expressly articulating the thought, that the total of the claims will exceed the amount of the retainage. If that assumption is correct, and it usually seems to be in this type of litigation, then other claimants will be proportionately deprived when the pro rata processing occurs. The legislature of Illinois by enacting Ill.Rev. Stat. ch. 13, Sec. 13, obviously desired to make unpaid laborers whole without their having to bear collection expenses. While paying due respect to this laudable motivation, we are of the opinion that the allowance of claims at this point should be limited to the unpaid claims themselves and should not include collection costs such as attorneys' fees. Accordingly, the attorneys' fees will not be properly allowable on the Laborers' claim. Of course, if our assumption on the relationship of assets to claims is incorrect and there should be a surplus returnable to Parkhill, Laborers would be in a position to proceed toward recovery of the statutorily allowed fees.
 
 
 59
 There is one other claimant to this fund whom we must consider. The district court in its Decision and Order granted priority to the claim of an attorney for Parkhill, Inc., one Frank O. Wetmore, II, in the amount of $11,075.00. Wetmore had filed a notice of attorney's lien against the retainage, pursuant to Ill.Rev.Stat.1971, ch. 13, Sec. 14, for his services in allegedly making most of the retainage available to the Government. Mr. Wetmore alleged that it was due almost entirely to his efforts that the claims of the various laborers and materialmen against the fund were disallowed. He filed the various interrogatories, the answers to which showed that no claimant had perfected a lien under the Illinois Oil and Gas Lien Act. He also filed the motions for summary judgment against those claimants, most of which motions were granted by the district court. Wetmore's claim of priority over the Government is based upon 26 U.S.C. Sec. 6323(b)(8). The Government in cause No. 72-1899 contends that priority was improperly granted under that section because Wetmore did not independently produce the fund; it was obtained by Natural's decision to interplead it.
 
 
 60
 Because of the decision we have reached above with respect to the rights to the retainage of various creditors of Parkhill, Inc., we do not have to resolve the controversy. Since we have held that the Government's rights to a portion of the retainage arise from its being listed as one of the classes of creditors in subparagraph .312, rather than from the federal tax lien statute, Wetmore cannot claim any rights under 26 U.S.C. Sec. 6323(b)(8).
 
 II
 
 61
 The second fund involved in this appeal is the residue which resulted from the sale of construction equipment after a chattel mortgagee was paid. The priority of the chattel mortgage was established in Avco Delta Corporation Canada Ltd. v. United States, 321 F.Supp. 241 (S.D.Ill.1971), aff'd, 459 F.2d 436 (7th Cir. 1972). The residue fund is approximately $600,000.00. The Government has filed a tax lien against this fund. The various Parkhill Companies contend that the Government is now taking a position inconsistent with that advanced in the prior litigation in this court. Parkhill petitioned the district court for a partial release of the escrow fund on the basis that the Government has "seized and tied up all of the assets" of the various Parkhill Companies, that the inconsistent position of the Government is due to the fact that Parkhill has substantial defenses to the Government's claim, and that the Government's actions "deny the constitutional guarantees of due process and representation by and assistance of counsel contained in the Fifth and Sixth Amendments to the United States Constitution." The district court ordered "[t]hat $60,000 be released from said escrow fund . . . to be drawn on now and in the future by [Parkhill] INC., [Parkhill] LTD., and [Parkhill] Construction for the payment of costs and attorney's fees now accrued and owing, or necessarily accruing in the future, for the proper and effective representation of INC, LTD, and Construction in this action."[10]
 
 
 62
 Insofar as the district court granted a partial release of funds to pay already accrued legal expenses, it was in error since the payment of those expenses does not clearly affect the ability to obtain counsel in future proceedings. But we are also compelled to reverse the entire release of funds on the basis of prematurity as required by our decisions in Illinois Redi-Mix Corp. v. Coyle, 360 F.2d 848 (7th Cir. 1966), and United States v. Brodson, 241 F.2d 107 (7th Cir. 1957) (en banc), cert. denied, 354 U.S. 911, 77 S.Ct. 1297, 1 L.Ed.2d 1428. The facts of the present case are basically indistinguishable from those in Illinois Redi-Mix Corp., supra. In both cases there was an interpleaded fund with claims put forth by general creditors of the taxpayer, the taxpayer itself, and the Government. In both cases it was alleged that all of the assets of the various corporation-taxpayers were subject to notices of levy or impounded in the interpleader action. This court stated, in reversing the district court's order allowing a partial release,
 
 
 63
 "The claim, in substance, is that the vendor corporations will be denied a fair trial in the Tax Court at some time in the future if a portion of the interpleaded fund is not released. But it is presently impossible to determine whether any constitutional violations will occur; that can be decided only after the trial. Therefore, the issue is not ripe for judicial determination. . . . The constitutional question in this case was prematurely decided." 360 F.2d at 849-850.
 
 
 64
 The Parkhill Companies attempt to distinguish their case from Illinois Redi-Mix on the ground that in their case the Government has seized the property not only of the allegedly delinquent taxpayer, but also of two corporations, Construction and LTD, against whom there is no outstanding tax liability. Admittedly, the Government does rely on either an alter ego theory or a fraudulent transfer theory. But we do not see that this truly distinguishes the case from Illinois Redi-Mix. If, as the Government alleges, there has been a fraudulent transfer or the various corporations are mere alter egos, then the Government would have a right to proceed against the property. The contention that the Government's actions will cause an unfair trial in the future is still capable of determination only after that trial takes place.
 
 
 65
 Furthermore, we note that the result we have reached in the first part of this case will provide an incentive for the various creditors of Parkhill, Inc., to dispute the validity of the Government's tax claims in order to reduce the total claims being brought against that fund. Thus, Parkhill may through this source receive additional aid in any further proceedings in the district court. In conclusion, we reverse the allowance of partial release of funds to the Parkhill Companies. The Government should be on notice, however, that we will carefully scrutinize any further appeals to see if in fact Parkhill has been denied due process of law by a constitutionally violative overreaching by the Internal Revenue Service.[11]
 
 
 66
 For the reasons hereinbefore given, the judgments of the district court are reversed and the causes remanded for further proceedings not inconsistent herewith.
 
 
 67
 Reversed and remanded.
 
 
 
 [1]
 These two cases were argued and briefed separately; however, the overlap of the material facts as well as of the legal principles involved in the disposition of the two cases has led us to consolidate them in one opinion
 
 
 [2]
 Although no party has seen fit to include an original copy of the construction contract in the record before us, there does not appear to be any reason to doubt that these provisions alleged in the counterclaim by Natural are the pertinent portions of the contract
 
 
 [3]
 The Government in its answer to the counterclaim of Natural alleged the following facts:
 A delegate of the Secretary of the Treasury made an assessment against Canadian Parkhill Pipe Stringing, Inc., for withholding and F.I.C.A. taxes for the third and fourth quarters of the year 1969 in the respective amounts of $778,447.10 and $13,677.96 on February 6, 1970. A delegate of the Secretary of the Treasury filed Notices of Liens as follows: Secretary of State for the State of New York, February 9, 1970; Recorder of Deeds of Bureau County, Illinois, February 16, 1970; Clerk's Office of Tulsa County, Oklahoma, April 21, 1970; and with the Recorder of Deeds, Washington, D. C., May 12, 1970.
 
 
 [4]
 At oral argument, counsel for one of the claimants alleged for the first time that since Parkhill, Inc.'s principal executive office was located in Canada, the Government's lien did not attach to the retainage (personal property) until it was filed in the District of Columbia. 26 U.S.C. Sec. 6323(f)(2)(B). Under this view, Wolf would be a prior judgment lien creditor on its garnishment and would have priority, under the Supreme Court's decisions, over the Government. 26 U.S.C. Sec. 6323(a). Since we are holding that the Government's contention that Parkhill, Inc., had a valid property interest in the entire retainage is incorrect, we will not attempt to resolve the issue except to note that, in the counterclaim for interpleader, Natural alleged that Parkhill, Inc., was a New York corporation
 We also do not have to consider Laborers' claim that even though it did not file a lien under the Illinois Oil and Gas Lien Act it still qualified under the definition of mechanics' lienor, 26 U.S.C. Sec. 6323(h)(2).
 
 
 [5]
 In Aquilino, the subcontractors had sued to foreclose their mechanics' liens, but apparently because Sec. 3672 of the Internal Revenue Code of 1939, the predecessor to 26 U.S.C. Sec. 6323, did not give priority to mechanics' liens which attached before the Government's tax lien under Secs. 3670 and 3671, but were not reduced to judgment until after the lien attached, their liens were of no effect. It was not until 1966 that Sec. 6323 was amended specifically to mention mechanics' lienors and to give them priority over subsequent federal tax liens, Sec. 6323(a) and (h)(2)
 
 
 [6]
 As to all of those claimants to the interpleaded fund who did not appeal the adverse judgments, and whose adverse judgments are final, such judgments may be res judicata
 
 
 [7]
 Recently, the Illinois Supreme Court in Rozny v. Marnul, 43 Ill.2d 54, 60, 250 N.E.2d 656 (1969), declined an opportunity to broaden the rights of third party beneficiaries. In a suit by the purchaser of land against a surveyor who had surveyed property inaccurately so that the vendor had built improvements on an adjacent lot, the court chose to rely on a tortious misrepresentation theory rather that on an expanded third-party beneficiary theory (that is, that the survey was done for the "benefit" of some unknown and ultimate purchaser of the land from the builder) in awarding relief
 
 
 [8]
 Since it is clear that Natural was interested in protecting itself and its property against any liens, it would be logical in interpreting the clause to say that any party was a valid lien against Natural's property under the Illinois Oil and Gas Lien Act would have priority to the extent of such lien. But as there are no such liens in the present case, we do not have to decide that question. We do note that such an approach would be consistent with the language of the predecessor to the Miller Act which gave claims of the Government priority in payment over claims of the materialmen. American Surety Co. v. Westinghouse Electric Manufacturing Co., 296 U.S. 133, 135, 55 S.Ct. 9, 80 L.Ed. 105 (1935)
 
 
 [9]
 Since the matter was not raised in this appeal, we have expressed no opinion as to whether there is any legal basis for the dismissed claimants in this in fieri litigation to seek successfully to set aside the adverse judgments against them
 
 
 [10]
 The relationship between Canadian Parkhill Pipe Stringing Ltd., which is the sole shareholder of the taxpayer, Canadian Parkhill Pipe Stringing, Inc., d/b/a Parkhill Pipeline, Inc., and the chattel mortgage debtor, Canadian Parkhill Construction Equipment, Ltd., is set out in some detail in Avco Delta Corporation Canada Ltd. v. United States, 459 F.2d 436 (7th Cir. 1972)
 
 
 [11]
 In its brief in this court, Canadian Parkhill makes reference to Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Clearly Fuentes and Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), undercut the constitutionality of most summary prejudgment remedies. But since the total invalidity of the Government's tax lien and jeopardy assessment was never presented to the district court, nor actually presented to this court, we will not intimate any view on the issue