Elizabeth BEVERLY, etc.,
Plaintiff-Appellant,

v.

John W. MACY, Jr., et al.,
Defendants-Appellees.

Elizabeth BEVERLY, etc.,
Plaintiff-Appellant,

v.

NATIONAL FLOOD INSURERS
ASSOCIATION, et al.,
Defendants-Appellees.

No. 81–7908.

United States Court of Appeals,
Eleventh Circuit.

April 11, 1983.

Vance, Circuit Judge, filed dissenting opinion.

Joseph J. Boswell, Mobile, Ala., for plaintiff-appellant.

Edward J. Vulevich, Jr., Asst. U.S. Atty., Mobile, Ala., Federal Emerg. Mgmt. Agcy., Robert S. Brock, Washington, D.C., for defendants-appellees.

Before VANCE and ANDERSON, Circuit Judges, and ALLGOOD *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Elizabeth Beverly, seeks relief from the denial of a claim for flood insurance pursuant to a lapsed policy issued by the National Flood Insurers Association ("NFIA"). Plaintiff contends that as a third-party beneficiary under a contract between the NFIA and Hartford Insurance Group, she is entitled to compensation for the loss of her house due to flooding.[1] The trial court held that Mrs. Beverly did not enjoy third-party beneficiary status, and granted a summary judgment in favor of the defendants. We reverse and remand.

## I. THE NATIONAL FLOOD INSURANCE PROGRAM

In 1968, the United States Congress enacted the National Flood Insurance Act. See Pub.L. 90–448, 82 Stat. 572 (1968) (codified at 42 U.S.C.A. § 4001, et seq. (West 1977)). The purpose of this legislation was to:

> authorize a flood insurance program by means of which flood insurance, over a period of time, can be made available on a nationwide basis through the cooperative efforts of the federal government and the private insurance industry, and (2) provide flexibility in the program so that such flood insurance may be based on workable methods of pooling risks, minimizing costs, and distributing burdens equitably among those who will be protected by flood insurance and the general public.

42 U.S.C.A. § 4001. Section 4011 of the Act authorized the Secretary of Housing and Urban Development ("HUD") to establish and carry out this program, and particularly to encourage "appropriate financial participation and risk sharing in the program by insurance companies and other insurers." 42 U.S.C.A. § 4011(b). Further, §§ 4051 and 4052 authorized the Secretary to encourage the creation of "pools" of insurance companies and to enter into agreements with such pools, all with a view towards providing the flood insurance mandated by the Act.

The NFIA was an unincorporated association of individual member insurance companies associated for the purposes of participating in the National Flood Insurance Program ("NFIP"). On June 6, 1969, and pursuant to § 4052 of the Act, the Secre-

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. The jurisdictional basis for plaintiff's claim was diversity of citizenship, 28 U.S.C.A. § 1331 (West 1981).

tary of HUD entered into a contract with the NFIA whereby the NFIA agreed to provide flood insurance policies available to the general public. This contract obligated the Association to "exercise its best efforts to provide a continuous program of flood insurance pursuant to the Act and the terms of this agreement." Supp. Record on Appeal, p. 152 (Contract between NFIA and HUD). The NFIA further agreed to issue and service individual flood insurance policies, and to investigate, adjust, and settle all claims under such policies. Under the terms of both the contract and the Flood Insurance Act, HUD was required to subsidize policy premiums, thereby reducing the risk assumed by the insurers and making the insurance available to consumers at reasonable rates.[2] By written agreement between the Department of HUD and the NFIA dated November 19, 1974, the NFIA was permitted to subcontract out to Bradford Computer & Systems, Inc. for "a system of computerized flood insurance policy writing, billing and processing, and other statistical and computer services." Supp. Record on Appeal, p. 169 (agreement between HUD and NFIA). This contract with Bradford was terminated on November 1, 1976, and thereafter the NFIA itself performed the processing of bills. *See* Record on Appeal, p. 120 (affidavit of William R. Cunning, General Counsel for Litigation, Federal Emergency Management Agency).

The Hartford Insurance Group ("Hartford") was a member of the NFIA. In 1976, Hartford entered into a contract with the NFIA whereby Hartford would service all of the NFIA flood insurance policies issued in the state of Alabama. This is the contract with respect to which Mrs. Beverly claims the status of third party beneficiary. This contract was retroactive to July 1, 1976, and provided in part:

1. Servicing Company [Hartford] shall use its best efforts to arrange for the issuance of flood insurance policies and

renewals thereof in the designated jurisdiction to any person or organization qualifying for such coverage on such terms and conditions and in consideration of such premiums as directed by NFIA. All policies and renewals shall be issued in compliance with the Act, any act amendatory thereof, and the regulations issued pursuant thereto as they may be amended from time to time.

. . . . .

4. Servicing Company shall follow procedures, adhere to the time standards and utilize the forms set forth in the Servicing Company Manual and the Flood Insurance Manual provided by NFIA as they may be amended from time to time. *Said manuals are incorporated herein, made a part hereof, and are attached as attachments I and II.*

5. Servicing Company agrees to assist NFIA in its responsibilities for the promotion of the National Flood Insurance Program.

. . . . .

7. NFIA and Servicing Company agree to comply with the Standards and Guidelines of Minimum and Maximum Performance (the Guidelines), as they shall be amended from time to time, for the services to be performed in this Agreement. Said Guidelines are attached hereto as Attachment III and incorporated herein by reference.

Supp. Record on Appeal, pp. 179–80 (service agreement) (emphasis added). The Flood Insurance Manual and the Guidelines and Standards Book referred to above were drafted by the NFIA for the specific purpose of facilitating the administration of its responsibilities under the Flood Insurance Program. The Flood Insurance Manual, which as noted above was incorporated into the contract at issue here, states in pertinent part:

**2.** The actuarial risks involved in underwriting flood insurance are such that prior to the act private insurers were unable to provide coverage at rates affordable to the general public. Thus, the Act was designed to secure the in-

volvement of the private insurance industry by providing equalization payments and other forms of subsidies to compensate insurers for charging reasonable premiums.

Flood insurance, as provided through the National Flood Insurers Association ... under the provisions of the National Flood Insurance Act of 1968 or any acts amendatory thereof ... shall be written only with the Standard Flood Insurance Policy approved by the Federal Insurance Administrator together with the appropriate Application and Declarations Form specified herein, and only in accordance with these rules and rates, which have been adopted by or for the Association and shall govern in all instances.

. . . . .

In order to avoid a lapse of the policy because the premium for the succeeding policy term was not paid prior to expiration of the then current term, an expiration or premium notice will be issued to the payor at least 45 days prior to each annual expiration date. *It is the responsibility of the agent to see that the policy is renewed.*

. . . . .

The sequence of events for the renewal of a given policy is determined by the amount of information in NFIA files and by the proximity of that policy's expiration date. If the NFIA can determine rates and calculate renewal premiums for a given policy, the payor and agent are notified ... of the approaching expiration date, and instructed to remit the appropriate premium for the renewal. The renewal premium can be remitted by either the payor or the agent, but not by both. If the payor fails to respond to the first notice, a second notice ... is sent to the agent and the mortgagee. If the policy is not renewed, the insured and the agent will be notified of the expiration approximately 45 days after the expiration date.

Supp. Record on Appeal, pp. 195, 210, 254 (emphasis in original). The Guidelines and Standards Book states:

The vast majority of flood insurance policies are renewed by means of NFIA's computerized direct billing system. Occasionally, however, a policy may have to be manually renewed by means of an application submitted by the agent to the servicing company. For those few instances when a manual renewal may occur, a processing chart and time table is presented below.

Supp. Record on Appeal, p. 340.

On December 30, 1977, the Department of HUD and NFIA executed an agreement in which the Department assumed responsibility for the continuation of coverage under previously-issued flood insurance policies. HUD also assumed responsibility for the defense of litigation pending on January 1, 1978, or instituted thereafter against the NFIA or any of its member companies. On April 1, 1979, executive order 12127 (44 Fed.Reg. 19,367) transferred to the Federal Emergency Management Agency ("FEMA"), pursuant to Reorganization Plan No. 3 of 1978 (43 Fed.Reg. 41943) the operation of the Flood Insurance Program. Thus, the FEMA is the successor in interest of the NFIA.

## II. THE LAPSED INSURANCE POLICY

In 1971, Elizabeth and Willie G. Beverly were joint owners of real property in Gulf Shores, Alabama, under warranty deed as tenants in common with rights of survivorship. In 1971, Mr. Beverly purchased a flood insurance policy from the NFIA insuring the property. Under the NFIA's agreement with Hartford, Hartford was the company responsible for servicing Mr. Beverly's policy from and after July 1, 1976. This policy was to be effective for a period of one year, "and thereafter for successive policy terms of one year, provided the then current premium payable by the insured for each successive policy term is paid prior to the expiration of the then current policy term, and if not so paid, this policy shall then terminate." Record on Appeal, p. 34 (insurance policy).

For the next four years, Mr. Beverly received premium due notices annually from both the NFIA and the insurance agent, and he paid the premiums so that the policy was kept in force through August 21, 1976.

Apparently, Mr. Beverly did *not* receive notice of the impending lapse of the policy in August of 1976, however. Thus, the policy lapsed on August 21. Nor did Mr. Beverly receive notice *after* expiration of the policy.

On December 30, 1976, Mr. Beverly died and Mrs. Beverly became the sole owner of the property. At no time after Mr. Beverly's death did Mrs. Beverly receive any premium due or expiration notices.[3] Consequently, no premiums were sent to the NFIA after Mr. Beverly's death, and the policy was not renewed after August 21, 1976. In her deposition, Mrs. Beverly stated that her husband had handled all of the family business; apparently, her only knowledge of the insurance policy was that a premium was due whenever a premium due notice was received. After Mr. Beverly's death, the chore of paying bills fell to Mrs. Beverly, and she would pay her various premiums whenever she received her notices. Because her State Farm Insurance Company agent handled all of her other types of homeowner's insurance, she was under the impression that she was also paying her flood insurance premiums whenever she mailed a check to her agent covering these other insurance policies.

On September 12, 1979, Hurricane "Frederick" struck Gulf Shores, Alabama, destroying Mrs. Beverly's beach house. Acting under the impression that her flood insurance policy was still in effect, Mrs. Beverly submitted a sworn proof-of-loss statement to the FEMA (the NFIA's successor), claiming payment under the policy. Mrs. Beverly's claim was denied by the FEMA on December 26, 1979.

On December 17, 1980, Mrs. Beverly filed suit in the Federal District Court for the Southern District of Alabama. In her amended complaint[4] she alleged that she was a third-party beneficiary of the service

agreement between the NFIA and Hartford. Specifically, she asserted that the NFIA and Hartford breached the service agreement by failing to send renewal and expiration notices as required by the manuals expressly incorporated into that contract. On April 27, 1981, John W. McConnell, acting director of the FEMA, was substituted for Hartford and the NFIA as the sole party defendant. The district court then granted summary judgment in favor of the defendant, ruling that Mrs. Beverly was not a third-party beneficiary of the service agreement and that the agreement did not require either the NFIA or Hartford to send notices. This appeal followed.

## III. WHICH LAW GOVERNS

As a threshold matter, we must determine whether plaintiff's claim to third-party beneficiary status under the service agreement is governed by state law or by federal law. Appellant argues that because the service agreement was entered into by private parties the law of the situs of the incident giving rise to liability, Alabama, governs. Appellee argues that federal law governs the interpretation of the service agreement because it was entered into pursuant to authorization under the National Flood Insurance Act. The district court did not rule on this issue, and it is not clear which law it applied. In our view, however, state law does not govern this dispute; rather, we are free to apply general principles of contract law.

When a claim is founded on diversity of citizenship, 28 U.S.C.A. § 1332 (West 1981), the rule of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), normally governs and we would usually apply the law of the forum state, in this case Alabama. However, there is an exception to the *Erie* rule in

---

**3.** Because of the summary judgment posture of this case, and our disposition of the third party beneficiary claim, the parties will be free to develop more fully the exact events which occurred upon remand to the trial court.

**4.** Mrs. Beverly's original complaint named as defendants NFIA, Moon Landrieu, as Secretary

of HUD, and John W. Macy, Jr., as director of the FEMA. In this complaint, Mrs. Beverly also pleaded four other separate causes of action. Mrs. Beverly subsequently amended her complaint to strike all defendants except Hartford and the NFIA as well as all claims except the third-party beneficiary claim.

diversity cases where a uniform national rule is necessary to further strong and expressed interests on the part of the federal government. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Bank of America Nat'l Trust & Sav. Ass'n v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); *Jacksonville Terminal Co. v. Florida East Coast Ry. Co.,* 363 F.2d 216 (5th Cir.), *cert. denied sub nom. Atlantic Coast Line R.R. Co. v. Florida East Coast Ry. Co.,* 385 U.S. 950, 87 S.Ct. 321, 17 L.Ed.2d 227 (1966).[5] This exception, better known as the *Clearfield Trust* Rule,[6] generally obtains in cases involving obligations of the federal government, obligations and rights of private parties created by federal law, or objects and instrumentalities over which the federal government has an overriding interest. *See, e.g., United States v. Kimbell Foods, Inc.,* 440 U.S. at 726–27, 99 S.Ct. at 1457–58 (in dispute over whether contractual liens arising from federal loan program take precedence over private liens, federal law applies); *Clearfield Trust Co. v. United States,* 318 U.S. at 366–68, 63 S.Ct. at 574–76 (rights and duties of United States on commercial paper it issues governed by federal law); *Jacksonville Terminal Co. v. Florida East Coast Ry. Co.,* 363 F.2d at 219 (in matters having direct relation to effective operation of important instrumentality of interstate commerce, federal standards must control). Further, "*Erie* is inapplicable in those areas of law so dominated by the sweep of federal statutes that legal relations they affect must be deemed governed by federal law." *Sola Elec. Co. v. Jefferson Elec. Co.,* 317 U.S. at 176, 63 S.Ct. at 173–74 (state estoppel law not allowed to thwart purposes of federal statute); *see United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) (because land acquisition was one arising from and bearing heavily upon federal regulatory program, federal law would govern, particularly when federal government was party to transaction). *See generally* 1A *Moore's Federal Practice* ¶ 0.319, at 3252–56.

Application of the *Clearfield Trust* Rule is most compelling when the application of state law would have a serious effect on the rights and duties of the United States, as for example when the United States is a party to the lawsuit or the subject of the lawsuit is a transaction in which the federal government was a party. *See generally Miree v. DeKalb County,* 433 U.S. at 28–33, 97 S.Ct. at 2493–96. It is this strong federal "stake" or interest in the outcome of the litigation which gives rise to the need for a uniform national rule and rebuts the presumption that state law applies. *See Clearfield Trust Co. v. United States,* 318 U.S. at 367, 63 S.Ct. at 575.

■ Applying the foregoing principles to the instant case, we note the following. First, although the United States was not a party to the contract under which the appellant claims third-party status, the United States is a party to this litigation by virtue of its having assumed in 1977 all responsibility for the continuation of coverage under existing flood insurance policies. Second, all insurance policies serviced pursuant to the "private" service agreement in question were heavily subsidized by the federal government. Moreover, while the flood insurance program was in effect, the federal government assumed most of the insurer's economic risks. *See* 42 U.S.C.A. §§ 4014, 4015, 4054, 4055 (government to pay insurer premium equalization rates

---

**5.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the Former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**6.** *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

based on difference between premiums charged to insured and actual cost of risk involved); Department of Housing & Urban Development, National Flood Insurance Program, Secretary's Report to Congress, 42 Fed.Reg. 58569–75 (1977) (program requires extensive public subsidies to reduce premiums to less than actuarily sound level) (insurance companies basically not at risk; cost of insurance is borne primarily by insured property owners and government; since 1969 no insurer has expended any promised risk capital); Supp. Record on Appeal, pp. 154–57 (contract between HUD and the NFIA).[7] Third, the Flood Insurance Act itself was an attempt to set up a comprehensive and national flood policy by assuming those risks that private industry itself was unwilling to assume.[8] In addition, the flood insurance program was partially intended to encourage state and local governments to be more active in regulating the development and use of land that is exposed to potential flood damage, thereby relieving the federal government of the heavy burden of flood disaster relief. *See* 42 U.S.C.A. § 4001. Finally, the national scope of the flood insurance program was recognized by the NFIA itself in its agreement with HUD, its service agreement with Hartford, and the flood insurance manual which it drafted. Because the rights and liabilities of the federal government in its administration of a nationwide program are at issue here, we conclude that state law does not apply.[9] *See Owens v. Haas,* 601 F.2d 1242, 1248–50 (2d Cir.), *cert. denied sub nom. County of Nassau v. Haas,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

We are bolstered in our conclusion by litigation in the Former Fifth Circuit concerning the scope of *coverage* of the NFIA insurance policies. In *Mason Drug Co. v. Harris,* 597 F.2d 886 (5th Cir.1979), the court held that conclusions regarding the *language* of NFIA insurance policies are controlled by application of federal law. *Accord West v. Harris,* 573 F.2d 873 (5th Cir.1978), *cert. denied,* 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979); *Drewitt v. Aetna Casualty & Surety Co.,* 539 F.2d 496 (5th Cir.1976); *Gement v. Allstate Ins. Co.,* 516 F.Supp. 11 (D.La.1981). Because construction of an insurance policy also involves the interpretation of an agreement entered into between two private parties, we view our holding as not extending the rule established in the foregoing cases:

> Since the flood insurance program is a child of Congress, conceived to achieve policies which are national in scope, and since the federal government participates extensively in the program both in a supervisory capacity and financially, it is clear that the interest in uniformity of decision present in this case mandates the application of federal law.

*West v. Harris,* 573 F.2d at 881. Finally, we are not hindered in this regard by an absence of explicit federal statutory law to apply. Rather, we are free to apply generally accepted contract principles to this dispute. *See United States v. Little Lake Misere Land Co.,* 412 U.S. at 593–94, 93 S.Ct. at 2397–98; *Jacksonville Terminal Co. v. Florida East Coast Ry. Co.,* 363 F.2d at 219.[10] We thus proceed to the merits of appellant's third-party beneficiary claim.

**7.** The Secretary of HUD was also authorized to arrange for reinsurance coverage by the Department in the event the Pool of insurers suffered an excessive loss. *See* 42 U.S.C.A. § 4055 (West 1977); *Pennsylvania v. National Ass'n of Flood Insurers,* 520 F.2d 11, 16–17 (3d Cir.1975) (discussing relationship between HUD and NFIA).

**8.** *See* 1968 Code Cong. & Ad.News 2873, 2965–69 (flood disasters requiring expensive federal relief because risk insurance unavailable).

**9.** Because the resolution of appellant's contract claim will have a direct effect upon the United

States Treasury, we view *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), as clearly distinguishable.

**10.** Although we are not *required* to apply state law, *Clearwater* and *Little Lake Misere* also make available to us as a matter "of federal policy" the choice to apply "borrowed" state law. *See United States v. Little Lake Misere Land Co.,* 412 U.S. at 594–97, 93 S.Ct. at 2397–99. Because the general principles governing third-party beneficiaries which we adopt are also accepted under Alabama law, *see Harris v. Board of Water & Sewer Comm'rs of Mobile,*

## IV. THIRD–PARTY BENEFICIARY STATUS

### A. The Obligation to Send Notices

Mrs. Beverly bases her claim for third-party beneficiary status on the service contract between the NFIA and Hartford and on the text of the Flood Insurance Manual and the Guidelines and Standards Book incorporated into that contract. As set forth above, Article I, Paragraph 4 of the service agreement expressly incorporates the Flood Insurance Manual, which states in part:

In order to avoid a lapse of the policy because the premium for the succeeding policy term was not paid prior to expiration of the then current term, an expiration or premium notice will be issued to the payor at least 45 days prior to each annual expiration date.

Supp. Record on Appeal, p. 210 (Insurance Manual). In addition, upon expiration of the policy, the insured was to be notified approximately 45 days after that expiration. Thus, the Manual clearly creates a duty to send renewal notices.

Appellee argues, however, that only Paragraph 4 of the service agreement incorporates the Flood Insurance Manual, that Paragraph 4 imposes obligations only on the *servicing company,* Hartford, and therefore that only those portions of the Manual which relate to Hartford's duties are incorporated into the service agreement. Appellee concludes that the service agreement

does not incorporate the provisions of the Manual which indicate that the NFIA shall send premium and expiration notices.[11]

■ We reject such a narrow and technical reading of the service agreement. The subject matter of the contract was the provision of flood insurance. Under the agreement, Hartford arranged for the issuance of insurance policies and processed the renewal applications that were generated by the NFIA's reminders to its customers that their policies were about to expire. Supp. Record on Appeal, p. 179, Art. I(A)(1). Further, Hartford was compensated for each policy, *id.* at 181, Art. II(A)(1), and for each renewal. *Id.* at 187.

It is understandable, even necessary, that the contract between the NFIA and Hartford would make provision for the sending of premium due notices; Hartford had an obvious interest in ensuring that renewal notices were sent lest policies lapse and its compensation decline. The NFIA, being responsible for the efficient management of the entire program, had an equally obvious interest in preventing the lapse of policies. The apparent interest of each party in making provision for such notices, as well as the NFIA's conduct in sending notices for four years, supports our interpretation that the NFIA was required to send such notices pursuant to the provisions of the Service Agreement. Similarly, the plain language

294 Ala. 606, 320 So.2d 624 (Ala.1975), we need not make this choice. *Compare Owens v. Haas,* 601 F.2d at 1250.

11. The argument assumes, of course, that the obligation to send notices which arises in the Manual falls on the NFIA, and not on Hartford. This assumption is correct. First, section 9 of the Manual includes copies of the various premium notices used by the NFIA. The Manual expressly states that these are *"to be issued by NFIA."* Supp. Record on Appeal, p. 193 (emphasis added). Second, according to both the Flood Insurance Manual and the Guidelines and Standards Book, the means by which renewal notices were to be processed depended upon the NFIA's ability to determine rates and calculate premiums. The Manual provides that "[a]pproximately four months before the expiration of a policy for which the [NFIA] has insufficient information to send a renewal notice directly to the insured the agent will re-

ceive a questionnaire to be filled out and returned to complete the files." *Id.* at 248. Thus, those policies for which the NFIA lacked the necessary information for automatic renewal would have to be renewed by hand. The Guidelines and Standards Book sets forth a comprehensive timetable for the processing of policies falling in this category. Further, the book imposes certain "standards" on the performance of this function. *See* Supp. Record on Appeal, p. 340.

Further, all notices sent carried the name of the insurer, the NFIA, and not that of the servicing company. Finally, the record demonstrates that for four years the NFIA did, in fact, send such notices to Mr. Beverly. Thus, it would seem clear that the service agreement imposed a duty upon the NFIA to send renewal notices.

of the service agreement incorporates *all* of the Manual, not just a part thereof.[12]

This view is supported by Paragraph 7 of the Service Agreement, which requires *both* Hartford and the NFIA to comply with the Guidelines and Standards Book. The Guidelines state in part:

> The vast majority of flood insurance policies are renewed by means of NFIA's computerized direct billing system. Occasionally, however, a policy may have to be renewed by means of an application submitted by the agent to the servicing company.

Supp. Record on Appeal, p. 340. Thus, even if there were some merit to appellee's technical interpretation that Paragraph 4 incorporates only those portions of the Manual which relate to Hartford's duties, Paragraph 7 clearly imposes duties on NFIA as well as Hartford, and clearly incorporates the above quoted portions of the Guidelines which provide that the NFIA will handle renewal billings.

We thus reject the view that the NFIA was not obligated to abide by the very manual that it drafted to help administer the tasks delegated to it by contract with HUD. Rather, in our view, the entire NFIA insurance system envisioned the following scheme for processing renewals. Sometime prior to expiration of a policy the NFIA, through its computer system,[13] would determine whether or not it possessed sufficient information to calculate the renewal premium for a particular policy. If it had such information, it would send a premium due notice (Form NFIA–50) to the payor 45 days prior to expiration of the policy.[14] The payor and the agent would then fill out the application for a renewal of the policy and forward it directly to the servicing company. The servicing company would process the renewal application, receiving various sums of money from the NFIA for each renewal so processed. This administrative scheme clearly contemplated a contractual obligation on the part of the NFIA to send notices prior to the expiration of policies.[15]

---

**12.** Appellee argues that Article I(a)(1) of the service agreement, which provides that "[a]ll policies and renewals shall be issued in compliance with the Act, any Act amendatory thereof, and the regulations issued pursuant thereto" excludes its contractual assumption of any procedures governing renewal notices beyond those contained in either the statutes or regulations. We do not view the provision as extending so far. Rather, just as the parties to the contract certainly were entitled to save themselves time, paper, and money by incorporating the various manuals into the contract by reference, *see J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.*, 473 F.2d 212, 215 (5th Cir.1973), they were entitled to incorporate preexisting statutory obligations into the contract to clarify their respective responsibilities to each other as well as to third parties. *See Owens v. Haas*, 601 F.2d at 1250 n. 9 (enforcing third party rights to contract between United States Bureau of Prisons and Nassau County on basis of Bureau of Prisons Policy Statement incorporated into contract). So long as the statutory and regulatory duties do not *conflict* with the purely contractual duties, we must give effect to both.

**13.** Through November 1, 1976, the NFIA subcontracted computerized processing from Bradford and Systems, Inc. Thereafter, the NFIA operated its own computer system.

**14.** Appellee has not alleged that it would not have been able to calculate Mrs. Beverly's renewal premiums.

**15.** The parties have been unable to produce any cases reasonably on point. However, *Pennsylvania v. National Ass'n of Flood Insurers,* 520 F.2d 11 (3d Cir.1975), supplies an interesting contrast. In that case, the State brought a *parens patriae* action against the NFIA, HUD, and the United States seeking damages for the defendants' failure to publicize the availability of flood insurance prior to flooding. The plaintiff based its claim on statutory language authorizing the Secretary to disseminate information, as well as on language in the contract between HUD and the NFIA requiring the latter to use its best efforts to provide a continuous program of insurance. Finally, the plaintiff cited other contractual language requiring the NFIA to keep records disclosing the cost of, *inter alia,* "offering ... policies of flood insurance." The court ruled that this language was insufficient to create an obligation on the part of the NFIA to publicize the availability of insurance; that the NFIA was authorized to disseminate information, and would be reimbursed for publicizing the insurance, did *not* make publicizing obligatory on the NFIA. "Indeed when the contract is read in its entirety, as we must read it, the Flood Insurers' activities and obligations commence only *after an*

We turn now to the question of whether this obligation can be enforced by Mrs. Beverly.

### B. Governing Principles

■ It is well-established that the parties to a contract may create rights in a third-party beneficiary by manifesting an intention to do so. "The crucial inquiry involves a determination of intent, and third parties may sue on the contract only if it may be said to have been intended for their direct, as opposed to incidental, benefit." *Ross v. Imperial Constr. Co.,* 572 F.2d 518, 520 (5th Cir.1978) (applying Alabama law); *see Riegal Fiber Corp. v. Anderson Gin Co.,* 512 F.2d 784, 787–88 (5th Cir.1975) (applying Alabama law); *United States Pipe & Foundry Co. v. United States Fidelity & Guaranty Co.,* 505 F.2d 88, 90 (5th Cir.1974) (applying Alabama law). According to the Restatement (Second) of Contracts:

A beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of a promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302. Thus, the key inquiry is whether the claimant was intended to be benefited by the contract provision in question. *See id.; Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 307, 48 S.Ct. 134, 135, 72 L.Ed. 290 (1927); *Avco Delta Corp. Canada Ltd. v. United States,* 484 F.2d 692, 702 (7th Cir. 1973), *cert. denied sub nom. Canadian Parkhill Pipe Stringing, Ltd. v. United States,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *Mutual Benefit Health & Accident Ass'n of Omaha v. Bullard,* 270 Ala. 558, 120 So.2d 714, 723 (Ala.1960). Further, "[i]t is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made." Restatement (Second) of Contracts § 308; *see Owens v. Haas,* 601 F.2d at 1250; *Avco Delta Corp. Canada Ltd. v. United States,* 484 F.2d at 702; *Willamette-Western Corp. v. Columbia Pacific Towing Corp.,* 466 F.2d 1390, 1392–93 (9th Cir.1972); *Harris v. Board of Water & Sewer Comm'rs of Mobile,* 294 Ala. 606, 320 So.2d 624, 628 (Ala.1975); 4 Corbin, *Contracts* § 781.[16] Finally, when determining whether the parties to the contract intended to bestow a benefit on a third party, a court may look beyond the contract to the circumstances surrounding its formation. *See Ross v. Imperial Constr. Co.,* 572 F.2d at 520–21; Restatement (Second) of Contracts § 302, Reporter's Note.

With these principles in mind, we proceed to an examination of whether the obligation

---

application for insurance has been submitted." *Id.* at 19 (emphasis added). Having held that the contract created no obligation to publicize, the court found it unnecessary to determine whether the contract created "actionable third party rights." *Id.* at n. 17.

In the case at bar, however, the materials incorporated into the contract between the NFIA and Hartford were *specific* in the obligations they imposed. Further, the obligation to send notices was triggered *only* after the beneficiary was known to the NFIA as a policyholder. Thus, *Pennsylvania* supports the result we reach regarding the creation of an obligation to send notices.

**16.** The Restatement (Second) of Contracts also provides:

The fact that a beneficiary cannot be identified when the contract is made may have a bearing on the question whether the promisee intended to make a gift to him or otherwise to confer on him the right to the promised performance, and thus may determine whether he is an intended beneficiary or an incidental beneficiary.... But there is no requirement of identification prior to the time for enforcement of the right.

Restatement (Second) of Contracts § 308, Comment A. *See also Southern Farm Bureau Casualty Ins. Co. v. United States,* 395 F.2d 176, 178 (8th Cir.1968) (not necessary that beneficiary be one named in contract; may be member of class sufficiently described) (quoting *Carolus v. Arkansas Light & Power Co.,* 164 Ark. 507, 262 S.W. 330 (Ark.1924)).

to send notices was intended for the direct benefit of Mrs. Beverly.

### C. Was Mrs. Beverly an Intended Beneficiary?

■ The sending of premium due notices clearly is of substantial benefit to policy-holders such as Mrs. Beverly. The significance of this benefit, in our view, is probative of the parties' intent to render Mrs. Beverly a direct beneficiary of the contract. Nonetheless, appellee argues that the parties to the contract did *not* intend to bestow a benefit upon Mrs. Beverly, and that, at most, she was an incidental beneficiary of the service agreement. As support for this contention, appellee points to the trial judge's finding that "the principal object of the Service Agreement between NFIA and Hartford was to further their respective business interests." However, the economic motivation of the parties is not dispositive; rather, "the intention of the parties disclosed by the writing and surrounding circumstances known to the parties, *and not their motive*, determines the rights of the third-party beneficiary." *Mutual Benefit Health & Accident Ass'n of Omaha v. Bullard,* 120 So.2d at 723 (emphasis added); *see Fidelity & Deposit Co. of Baltimore v. Rainer,* 220 Ala. 262, 125 So. 55, 58–59 (Ala. 1929). Thus, the promisee need not be motivated solely by its desire to bestow a benefit upon the third party. *See Avco Delta Corp. Canada Ltd. v. United States,*

484 F.2d at 702–03 (promise need not be for sole benefit of third party as long as it was for direct or substantial benefit); *Harris v. Board of Water & Sewer Comm'rs of Mobile,* 320 So.2d at 628 (though promisee enjoys some degree of direct benefit from the contract, most direct benefit inures to third-party beneficiaries). For example, when A, for valid consideration, promises B that A will relieve B of his debt to C, the law regards C as the *intended* beneficiary despite the economic benefit which *motivated* B, the promisee. *See generally* 4 Corbin, *Contracts* §§ 782, 786.[17] Thus, the question of "intent to benefit" is more complex than an inquiry into whether the primary or sole purpose (or motive) was to benefit a non-party to the contract.

In probing the intention of the parties, reliance on the part of the putative third-party beneficiary can be a significant factor. *See* Restatement (Second) of Contracts § 302, Comment d. Here, this factor weighs heavily in favor of Mrs. Beverly. Through 1976, she was aware that premium due notices had arrived annually, and her undisputed expectation was that this practice would continue.[18] In our view, this reliance was reasonable, and its reasonableness strongly suggests that the parties contemplated a direct benefit to her through the NFIA's assumption of an obligation to send renewal notices. While this reliance, by itself, would not allow a court to read

**17.** Professor Corbin stated:

There are much more numerous cases in which the promised performance will directly benefit both the promissee and a third person. These include all of the creditor beneficiaries. It has sometimes been thought that a third person can enforce the contract only when he is the sole person to be benefited by performance. This is not now the prevailing law anywhere .... Wherever a promise is made to a debtor to pay his debt to a third person, the performance directly benefits both the third person and the promisee—the former by the receipt of money, the latter by being discharged from his debt. Neither one can be described as sole beneficiary. The problem before the courts today is not whether the third party must be the person solely to be benefited; he certainly need not be. It is to draw the line between those third persons whose benefit is so indirect and inci-

dental that it is not sound policy to let them enforce the contract, and those other persons whose benefit is so direct and substantial and so closely connected with that of the promisee that it is economically desirable to let them enforce it. The law would profit greatly if the courts would concentrate upon this aspect of the problem and cease to state the question merely in terms of the supposed "intent" of the parties.

4 Corbin, *Contracts,* § 786.

**18.** Because she was not aware of all of the details surrounding the insurance policies purchased by her husband, Mrs. Beverly apparently assumed that the notices she received after his death pertaining to other insurance policies covered her flood insurance as well. The reasonableness of this assumption will, of course, be an appropriate issue of fact on remand.

into the contract terms that do not exist (*see* 4 Corbin, *Contracts* § 779B), Mrs. Beverly's conduct when combined with the express obligations incorporated into that contract strongly suggests that she was a direct beneficiary rather than an incidental one. *See United States v. State Farm Mutual Ins. Co.,* 455 F.2d 789, 792 (10th Cir. 1972) (when contract imposes duty in favor of third party law presumes parties intended to confer benefit on third party); *United States v. United Services Automobile Ass'n,* 431 F.2d 735, 737 (5th Cir.1970) (Federal Government may sue as third-party beneficiary to collect on insurance policy requiring payment to any person or organization treating the insured), *cert. denied,* 400 U.S. 992, 91 S.Ct. 459, 27 L.Ed.2d 440 (1971).[19]

Further support for this conclusion may be found in the circumstances surrounding the formation of the contract. In our view, it is particularly significant that the NFIA was created for the sole purpose of participating in a government program designed to provide the fullest possible flood insurance protection to the public. This policy permeates the service agreement and the various manuals,[20] and also supports a finding of intent to benefit policyholders

through the sending of premium due notices. *See Owens v. Haas,* 601 F.2d at 1250.

 This is not to say that the NFIA owed a duty of any sort to the *general public.* The obligation at issue here runs only to existing policyholders, who already occupy a position of privity with regard to the NFIA. *Compare Gallagher v. Continental Ins. Co.,* 502 F.2d 827, 833 (10th Cir.1974) (no third party status for unnamed members of public at large to enforce contract between state and contractor); *Schell v. National Flood Insurer's Ass'n,* 520 F.Supp. 150, 157–58 (D.Col.1981) (contracts between federal government and the NFIA did not create duty to inform public at large of availability of flood insurance); Restatement (Second) of Contracts § 313. Because the obligation arose from express language in the service agreement and manuals incorporated therein, and because the obligation referred to a specific class of individuals clearly contemplated by the contract and identifiable at the time the obligation arose, we hold that policyholders were entitled, as third-party beneficiaries, to receive renewal notices 45 days prior to expiration of their policies.[21] Thus, Mrs.

**19.** In *Beckett v. United States,* 379 F.2d 863 (9th Cir.1967), the plaintiff had purchased stock debentures of a corporation after its agent showed him a contract between the corporation and an insurance company in which the latter insured the debentures. After the corporation became insolvent, the plaintiff sued the insurance company under a third party theory. The court of appeals held that the plaintiff was a third-party beneficiary under the insurance agreement, and that the insurance company was estopped from raising the conditional nature of the contract due to the plaintiff's reliance on the apparently unconditional, written insurance agreement. *Id.* at 861–62.

**20.** For example, the preamble to the Guidelines and Standards Book, binding on both parties, provides:

The National Flood Insurance Program represents a unique effort of cooperation between the Federal government and the property insurance industry. This cooperative effort is brought about by a working contractual relationship between the Federal Insurance Administration and the National Flood Insurers Association.

The National Flood Insurers Association (NFIA) is the organization of property insur-

ance companies participating in the flood insurance program. NFIA was created as a result of the passage of the National Flood Insurance Act of 1968 to provide the administration necessary to carry out the insurance functions that are contractually delegated to the insurance industry.

The primary responsibility of NFIA is to market flood insurance policies. This entails processing premiums as well as providing facilities for servicing the flood insurance policies in force. NFIA is also responsible for administering claim loss procedures and paying flood loss claims. NFIA is also committed to promoting the program and the general dissemination of information about the flood program.

. . . .

NFIA considers the development of an efficient network of servicing companies as presently the most effective means of administering this complex environment that comprises the National Flood Insurance Program.

Supp. Record on Appeal, p. 321.

**21.** The district court cited *Ross v. Imperial Constr. Co.,* 572 F.2d 518 (5th Cir.1978), in support of its conclusion that providing notice to policyholders was not a direct and primary

Beverly has third-party beneficiary standing to challenge the failure by the NFIA to discharge this contractual duty.

## V. CONCLUSION

Because the NFIA owed Mrs. Beverly a contractual duty to send her a premium due notice, we reverse the trial court's grant of summary judgment and remand for its consideration of the remaining issues. We express no opinion on the remaining issues in the case, including *inter alia:* (1) whether Mrs. Beverly was an insured under the lapsed flood policy; (2) whether as a factual matter the NFIA breached its contract by failing to send renewal notices; (3) whether the lack of insurance at the time of the flood was caused by appellees' breach of duty to send renewal notices (or on the other hand whether it was caused, for example, by Mrs. Beverly's own negligence); (4) whether the loss about which Mrs. Beverly complains was a loss covered by the flood insurance policy; and (5) the amount of the damages Mrs. Beverly would be entitled to should she prevail on the foregoing issues.

REVERSED AND REMANDED.

VANCE, Circuit Judge, dissenting:

The narrow issues before the court today are whether the National Flood Insurers Association (NFIA) breached a duty it owed to the Hartford Insurance Group (Hartford) under the service contract between NFIA and Hartford and, if so, whether NFIA and Hartford by contracting intended to directly benefit persons such as Mrs. Beverly making her a third party beneficiary under the contract. The service contract is essentially a subcontract in which Hartford has agreed to assume some of NFIA's policyholder servicing duties in return for a fee. Incorporated into the contract for specific purposes are various manuals authored by NFIA. Because Mrs. Beverly has failed to allege action or inaction on the part of NFIA or Hartford which amounts to a breach of a promise contained within the service contract, no cause of action has arisen under that contract.

NFIA's duty to notify policyholders forty-five days prior to the expiration of the policy and notify policyholders and their agents should the policy lapse is an independent duty owed by NFIA to others. It is certainly not a duty arising from the service contract, and no third party claims for breach of that duty can fairly be grounded on that contract. The district court, therefore, properly dismissed the complaint.[1]

The principal bases of appellants' claim to third party beneficiary status are sections four and seven of the service contract be-

object of the service agreement. We view the court's reliance on this case as misplaced. In *Ross,* a subcontractor sued the guarantor of a loan as a third-party beneficiary under the provisions of a contract between the guarantor and the bank that loaned money to the general contractor. Under the Guaranty Agreement, the guarantor guaranteed "the timely and faithful completion of the construction free from any and all liens." *Id.* at 520. The subcontractor argued that this language created an obligation on the part of the guarantor to pay sums due under their subcontracts with the general contractor. The court of appeals held otherwise, however, because the obligation to pay sums due subcontractors was *not* expressly contained in the agreement. In the absence of the expression of such a duty, it could not be said that the promisee, the lender, intended for the guarantee clause quoted above to bestow a benefit on third parties. *Id.* at 521–23.

In our view, *Ross* merely stands for the proposition that the best indication of whether an obligation was intended to benefit a third party

is whether a duty running to that third party expressly appears in the contract. An obligation to assume the debts owed subcontractors by the general contractor did not appear in the Guaranty Agreement; in the instant case, the obligation to send renewal notices appears in the manuals expressly incorporated into the Service Agreement.

1. Appellants' strained contract construction and pleading is an apparent attempt to avoid unfavorable circuit precedent which finds no private right of action in similar situations for breach of duty by a government agency or its contractor for violation of its statutory duties. *See Till v. Unifirst Fed. Sav. & Loan Ass'n,* 653 F.2d 152, 155–56, 158–61 (5th Cir.1981); *Roberts v. Cameron-Brown Co.,* 556 F.2d 356, 360–62 (5th Cir.1977). These decisions are binding as precedent in the eleventh circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

tween NFIA and Hartford. Section four requires Hartford to "Follow procedures, adhere to the time standards and utilize the forms set forth in the Servicing Company Manual and the Flood Insurance Manual ....." Appellant relies on the final sentence of this section: "Said manuals are incorporated herein, made a part hereof, and are attached as attachments I and II." This incorporation, she claims, entitles her to rely on language in the Flood Insurance Manual, made a part of the contract by section four, which recites that "[i]n order to avoid a lapse of the policy because the premium for the succeeding policy term was not paid prior to expiration of the then current term, an expiration or premium notice will be issued to the payor at least 45 days prior to each annual expiration date."

Documents incorporated into a contract by reference are made a part of that contract only for the purposes specified. *Guerini Stone Co. v. P.J. Carlin Construction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916); *McDonald v. Hamilton Electric Inc.,* 666 F.2d 509, 513 n. 6 (11th Cir.1982); *Ralston Purina Co. v. Barge Juneau and Gulf Caribbean Marine Lines, Inc.,* 619 F.2d 374, 375–76 (5th Cir.1980); *Hill & Combs v. First National Bank,* 139 F.2d 740, 742 (5th Cir.1944). Section four of the service contract merely creates a duty of Hartford to comply with the applicable procedures and time standards contained in the incorporated manuals and also to use the forms therein. It is clear that the manual provisions relied upon by appellants mention a duty of NFIA which is separate from and independent of its contract with Hartford and not incorporated into its agreement with Hartford by section four of the service agreement. The district court found and the parties agree that it was the responsibility of NFIA or another subcontractor, Bradford Computer & Systems, Inc., to send renewal notices and notification of failure to renew to the policyholder and agent. This was not a duty of Hartford under the service contract nor was it a duty owed to Hartford or to anyone else by NFIA *under the service contract.*

As additional evidence of a duty of NFIA under this contract to notify its policyholders, appellant also relies on the Guidelines incorporated into the contract by section seven of the service contract. The majority opinion emphasizes this section because it is the only one on which appellant relies where the incorporating language states a duty owed by NFIA as well as Hartford. In this section NFIA and Hartford agree to comply with

> the Standards and Guidelines of Minimum and Maximum performance (the Guidelines) ... *for the services to be performed in this Agreement.* Said Guidelines are attached hereto and incorporated herein by reference.

(emphasis added). The language in the Guidelines seen by appellant as imposing a duty of notification on NFIA is not a part of any of the standards or guidelines which make up the bulk of the document. It is best described as a parenthetical statement or an aside following a group of standards which serves as an introduction to a processing chart. The chart describes the method for manual renewal of a policy which occasionally must be performed by Hartford.

> The vast majority of flood insurance policies are renewed by means of NFIA's computerized direct billing system.
>
> Occasionally, however, a policy may have to be manually renewed by means of an application submitted by the agent to the servicing company.
>
> For those few instances when a manual renewal may occur, a processing chart and time table is presented below.

Guidelines at 21. The single sentence in this introductory remark does not make NFIA's independent obligation to notify its policyholders of renewal and lapse a "service to be performed" under the service agreement.

Except for the instances summarized above, there is no mention in the service contract of any obligation of NFIA to send renewal notices to policyholders or to inform them when their policies lapse. NFIA may have an obligation to its policyholders

apart from the service contract with Hartford. The meager references to this obligation in lengthy documents incorporated by reference into the service contract do not make the obligation one owed to Hartford or one owed anyone by virtue of the incorporation into the Hartford service contract. It is clear that the manuals and guidelines were incorporated in the service contract merely to describe the procedures and standards with which the parties must comply to perform their mutual obligations under the contract. Only a tortured reading of sections four and seven of the service contract and the materials incorporated therein would make NFIA's breach of its independent obligations to its policyholders a breach of its contractual obligations to Hartford. The parties had no intention to incorporate the extraneous materials into the service contract for any purpose other than those explained above. There is absolutely no indication that either party intended to confer a benefit on any third person or create a right in a third person based solely on language found in incorporated extraneous materials where the language relied upon is completely irrelevant to the purpose for which the materials were incorporated. *See Ross v. Imperial Construction Co.,* 572 F.2d 518 (5th Cir.1978); Restatement (Second) of Contracts § 302 & comment d (1981); Restatement of Contracts §§ 133(1)(a), 140 (1932).

Believing that appellants have alleged no breach of the service contract between NFIA and Hartford and that the district court's dismissal of the action was appropriate I respectfully dissent from the opinion of the court.