**In re WM. CARGILE CONTRACTOR, INC. ID# 31–0743140, Debtor.**

**Bankruptcy No. 1–92–04791.**

United States Bankruptcy Court, S.D. Ohio, W.D.

March 3, 1993.

Richard D. Nelson, Cincinnati, OH, for debtor.

Kim Martin Lewis, Cincinnati, OH, for Unsecured Creditors' Committee.

Robert G. Sanker, Michael L. Scheir, Cincinnati, OH, for the Unsecured Creditors' Committee.

Thomas Coffey, Cincinnati, OH, for National American Ins. Co.

Grady L. Pettigrew, Columbus, OH, for U.S. Fidelity & Guarantee Co.

Neal J. Weill, Office of the U.S. Trustee, Cincinnati, OH.

## DECISION ON MOTION OF NATIONAL AMERICAN FOR DIRECT PAYMENT

BURTON PERLMAN, Bankruptcy Judge.

This contested matter is before the court pursuant to a dispute between a surety, National American Insurance Company ("National"), and the Unsecured Creditors' Committee ("UCC") over the disposition of money held by Messer Construction Company ("Messer"), construction manager for a public construction project at the University of Cincinnati which is owned by the state of Ohio for work at the University of Cincinnati. The debtor, William Cargile Contractor, Inc. ("debtor"), is a subcontractor with respect to the project, and itself in turn employed subcontractors (hereafter "debtor's subs"). Before debtor filed its Chapter 11 petition, National issued performance bonds for certain construction work to be completed by debtor. These bonds guaranteed payment by debtor to debtor's subs and materialmen (referred to hereafter collectively as "debtor's subs"), including Carlisle Construction, TYS Construction and Baker Construction. Much of the work on the project has been completed. Debtor's subs, however, are owed approximately $60,000.00 for their work under subcontracts with debtor that were guaranteed by the bonds.

National seeks an order from this court authorizing Messer to pay debtor's subs directly, which right National asserts is based on provisions contained in the construction contract between Cargile and the University. National states that allowing the debtor's subs to receive the funds directly would allow debtor's subs to pay their labor expenses without having to expend the cost and effort of making claims against National. According to National, a direct payment of the funds would also reduce the ultimate claim against debtor by the amount equal to the payment. National bases its motion on two arguments. First, National asserts that debtor's subs are secured creditors based on properly filed mechanic's liens, which, although filed postpetition, nevertheless relate back to the first day work was performed. National states that since debtor's subs are fully secured, allowing them to be paid directly would not prejudice the rights of unsecured creditors, since those creditors have no right to the monies. Additionally, National asserts that the monies are not property of the estate pursuant to § 541 because of a trust agreement between itself and debtor arising out of the performance bonds, on the one hand, and out of the contract between debtor and the State, on the other.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. §§ 157(b)(2)(A).

We will first address the issue of whether debtor's subs are secured creditors. We note that debtor filed its Chapter 11 petition in September, 1992, and notices of debtor's subs' liens pursuant to Ohio Revised Code ("ORC") § 1311.26 were filed in December, 1992. National contends that although debtor's subs filed their liens postpetition, those liens nevertheless relate back to the first day each debtor's sub performed work on the job pursuant to ORC § 1311.13 and 11 U.S.C. § 546(b) of the Code.[1] In support of its relation back argument, National cites three cases: *In re Bain*, 64 B.R. 581, 583 (W.D.Va.1986); *In re Yobe Electric, Inc.*, 30 B.R. 114 (Bankr. W.D.Pa.1983), *aff'd*, 728 F.2d 207 (3d Cir. 1984); and *In re Fiorillo & Co.*, 19 B.R. 21, 24 (Bankr.S.D.N.Y.1982). The courts in those cases found that 11 U.S.C. § 362(b)(3) and § 546(b) work together to create an exception to the automatic stay. Those

---

**1.** Section 546(b) provides in relevant part that "the rights and powers of a trustee under sections 544, 545 and 549 of this title are subject to any generally applicable law and permits per-fection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection."

sections provide that the postpetition perfection of a lien does not violate the automatic stay if applicable local law allows the lien to relate back prepetition and therefore defeat the rights of a hypothetical lien creditor pursuant to 11 U.S.C. § 544. *See also* 4 *Collier on Bankruptcy* § 546.03[2], at 546–14 (15th ed. 1992).

Whether the liens of debtor's subs performing work on public works projects, then, relate back to the first day work was performed, depends on whether Ohio law so provides. The UCC asserts that ORC §§ 1311.26–.32 provides the exclusive statutory framework under which subcontractors may file liens for work done on public projects. *See State, ex. rel. General Electric Supply Co. v. Jordano Electric Co.,* 53 Ohio St.3d 66, 558 N.E.2d 1173, 1175 (Ohio 1990). The UCC states further that since there is no relation back provision within ORC §§ 1311.26–.32, and that ORC § 1311.13 specifically excludes public projects from the relation back provision, the legislature did not intend for such a provision to apply to public construction projects. The UCC contends that since the liens do not relate back to the first day of performed work, § 546(b) is inoperative, for the relation-back provision of that section depends on "generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection." The UCC concludes that since the liens are effective only upon filing, their postpetition filing violated the automatic stay under § 362(a)(4), and thereby rendered them void and without effect.

National's response to the UCC's statutory argument is that the sections of the Ohio Revised Code relating to mechanic's liens must be interpreted holistically, and that such an interpretation compels the conclusion that the relation back provision applies to both private and public construction projects. Rather than interpreting ORC §§ 1311.01–.24 and .26–.32 as distinctly applying to private and public projects respectively, as the UCC suggests, National argues that § 1311.26 is not a substantive statute, and thus, liens are not "created" pursuant to it; it is an enforcement statute which, together with ORC § 1311.28 merely create "stop notices," which grant an assignment of monies remaining due from the owner to the prime contractor. *See Turzillo Contracting Co. v. Cincinnati Metropolitan Housing Authority,* 10 Ohio St.2d 5, 225 N.E.2d 255, 259 (1967).[2] According to National, subcontractors' liens are created only pursuant to ORC § 1311.02, and since ORC § 1311.02 generally applies throughout the Ohio mechanic's lien statute, so does the relation back rule of ORC § 1311.13. National argues that accepting the UCC's statutory argument would effectively read out of the mechanic's lien statute several sections applying to mechanic's liens generally, including ORC §§ 1311.13, 1311.16, 1311.22, 1311.23, and 1311.24. National thus asserts that the debtor's subs' liens relate back to the first day work was performed, and that the debtor's subs are secured creditors with respect to the fund held by the state. National concludes that its position as surety entitles it to the same

**2.** ORC § 1311.26 provides:

Any subcontractor, materialman, or laborer who is performing or has performed labor or work or is furnishing or has furnished material for any public improvement provided for in a contract between the public authority and a principal contractor, and under a contract between the subcontractor, materialman, or laborer and a principal contractor or subcontractor, at any time, not to exceed one hundred and twenty days from the performance of the last labor or work or furnishing of the last material, may serve the public authority an affidavit stating the amount due and unpaid for the labor and work performed and

material furnished, when the last of the labor or work was performed and when the last of the material was furnished with all credits and setoffs thereon, and the post-office address of the claimant....

ORC § 1311.28, in turn, provides:

Upon receiving the affidavit required by section 1311.26 of the Revised Code, the public authority shall detain from the principal contractor or from the balance of the funds remaining in the contract with the principal contractor, an amount, up to the balance remaining in the contract, that does not in the aggregate exceed the claim or claims....

status through its derivative rights as subrogee.

■ In determining whether the subcontractors' liens relate back to the first day work was performed, we first note that the cases cited by National on this point are inapposite herein, since those cases interpret the mechanic's lien statutes of other states, and, more important, those cases involve privately-owned construction projects. Under Ohio law, the statutory provisions governing public and private construction projects are interpreted separately. The following passage from *Ohio Jurisprudence 3d* so indicates:

> The lien statutes which govern liens for private construction and improvements [ORC §§ 1311.01–.23] and those governing mechanics' liens for public works construction [ORC §§ 1311.26–.32] operate in distinct domains. The former set of statutory provisions are general in their operation, and under the rule that the state is not bound by the terms of a general statue unless it is expressly so enacted, such statutes are not binding with regard to public improvements made by the state. The general mechanic's lien statutes do not apply to public improvements owned or being constructed by public authority out of public funds where such statutes do not expressly so provide. Absent such express provision, the general language of mechanic's lien statutes give no remedy against the public.

68 *O.Jur.3d*, Mechanic's Liens § 227, at 305–06 (1986) (citations omitted). *See also* Marti & Goldstein, *Ohio Mechanics' and Materialmen's Liens* § 10–2 at 186 (2d ed. 1992) (hereafter "Marti & Goldstein") ("[t]he statutory provisions for the protection of subcontractors, materialmen, and laborers contributing to projects funded by the state or political subdivisions of the state are found in sections 1311.25 through 1311.32 of the Ohio Revised Code.").

■ An important aspect of Ohio mechanic's lien law is that unlike liens upon privately owned property, mechanic's liens with respect to work done on Ohio public projects attach not to the property, but to a public fund set aside for the payment of subcontracts. *Poenisch v. Kingsley–Dunbar, Inc.,* 64 Ohio App.3d 699, 582 N.E.2d 1071, 1073 (1990). *See also Talco Capital Corp. v. State Underground Parking Comm'n,* 41 Ohio App.2d 171, 324 N.E.2d 762, 766 (1974) (lien against public works only attaches to fund since law forbids execution against public property).[3] A discussion of the statutory framework enacted by the Ohio legislature regarding this fund begins with ORC § 1311.26, which provides that a subcontractor or materialman furnishing work or materials may file with the public project owner an itemized statement of labor performed or materials furnished. After receiving this notice, ORC § 1311.28 provides that the owner "shall detain from the principal contractor all *subsequent* payments as do not in the aggregate exceed such claim or claims." (emphasis added). The fact that the obligation of the public authority to detain money for the fund does not arise until after public authority receives the filed notice of lien pursuant to ORC § 1311.26 suggests that the mechanic's lien is not effective until it is filed. *See State ex. rel. Dinneen Excavating Co. v. Sykes,* 40 Ohio St.3d 84, 531 N.E.2d 1309 (1988); Marti & Goldstein, § 10–7 at 194. This conclusion is consistent with cases interpreting this statutory scheme which hold that a subcontractor may only be paid from a fund to the extent the owner still owes the prime contractor money on the project. *See, e.g., L.E. Myers Co. v. Jordano Electr. Co.,* 47 Ohio App.3d 132, 547 N.E.2d 1014, 1018 (1988); *Basic Construction Materials Division of Davon, Inc. v. Seiter,* Nos. 88AP–796, 88AP–812, 1989 WL 61758 (Ohio Ct. App. June 6, 1989). *See also* Marti & Goldstein, § 10–9 at 197–98 (liens have no value

---

**3.** The Ohio Supreme Court has held that the statutes relating to the attachment of a subcontractor's lien to a public fund regarding work done on publicly owned projects create a type of garnishment protecting the subcontractor against the risk of losing payments due him. *Turzillo Contracting Co. v. Cincinnati Metropolitan Housing Authority,* 10 Ohio St.2d 5, 225 N.E.2d 255, 259 (1967).

if the affidavit of lien pursuant to ORC § 1311.26 is received by the public owner after contract funds have been exhausted). We therefore conclude that mechanic's liens filed on public works projects do not relate back to the first day work is performed, but are effective only when filed.

In so ruling, we reject National's argument that the relation back of liens as provided by ORC § 1311.13 must apply throughout the whole statutory framework of mechanic's liens. First, as the foregoing discussion indicates, the case law and other secondary sources clearly treat liens on private and public property as operating in separate domains. Second, we reject National's argument that since mechanic's liens with respect to both privately and publicly owned projects are created solely pursuant to ORC § 1311.02, all of the sections of the Ohio mechanic's lien statute necessarily apply to both privately and publicly owned projects. While it is true that liens for both types of projects are created pursuant to ORC § 1311.02, the section expressly dealing with relation back, ORC § 1311.13, precludes application of ORC § 1311.02 to liens on public projects. The following language from that section demonstrates this: "Liens under sections 1311.01 to · 1311.22 [these exclude ORC §§ 1311.25 to 1311.32 which deal with public projects] ... for labor or work performed or materials furnished prior to the recording of the notice of commencement ... are effective from the date the first visible work is performed or the first materials are furnished...." ORC § 1311.-13(A)(1).

■ The significance of our determination that mechanic's liens filed with respect to public works projects are effective when filed and do not relate back is that in the present case, the liens filed postpetition violate the automatic stay pursuant to § 362(a)(5), and are therefore void. *See Matter of Valairco, Inc.,* 9 B.R. 289, 293–95 (Bankr.D.N.J.1981) (lien perfected by stop notice does not relate back where state mechanic's lien statute does not so provide; stop notice lien filed postpetition therefore void). *See also In re Smith,* 876

F.2d 524, 526 (6th Cir.1989) (actions in violation of automatic stay generally void even when creditor lacks notice of stay); Marti & Goldstein, § 12–7 at 251 n. 8. We thus hold that the subcontractors in this proceeding are unsecured creditors. The subrogation rights of National would therefore be those of unsecured creditors. *Ohio ex. rel. Star Supply v. City of Greenfield,* 528 F.Supp. 955, 958–59 (S.D.Ohio 1981).

We now address National's argument for direct payment to the subcontractors according to its trust argument. National contends that Paragraph 9 of an Indemnity Agreement between debtor and it provides that all funds received by debtor must be held in trust for the benefit of subcontractors furnishing labor and materials. Paragraph 9 of the Indemnity Agreement provides in relevant part as follows:

[I]t is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Indemnitor or Indemnitors or otherwise, for the benefit and payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds ... [This] trust also insures [sic] to the benefit of the Surety for any liability or loss it may have to sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

National additionally asserts that a trust exists based on the contract between the State and debtor pursuant to the following language from Paragraph 16(n) of the contract's General Conditions:

All monies paid on account to any Contractor for materials or labor shall be regarded as funds in trust for payment of any and all obligations relating to this Contract and no such amount of monies shall be permitted to accrue to the Contractor until such obligations are satisfied. Evidence, satisfactory to the Owner and Construction Manager may be required to show that all current obligations relating to this work are satisfied before releasing any payment due on the

work. Before payment of the final estimate, each Contractor shall file an Affidavit with the University of Cincinnati, through the C/M, stating that monetary obligations relating to lienable items in connection with the work have been fulfilled.

National asserts that the $60,000.00 in funds held by Messer are excluded from property of the estate by 11 U.S.C. § 541(d), which requires such exclusion where the debtor merely holds legal title to the funds held in trust, while the equitable rights of ownership to the funds are held for the benefit of the another. National relies on the Sixth Circuit case of *Federal Ins. Co. v. Fifth Third Bank*, 867 F.2d 330 (6th Cir.1989), in support of its proposition that express trust agreements are created by the bond instrument and especially by the contract between the State and debtor, and the fund held by Messer is thus prevented from becoming property of the estate. In *Fifth Third*, the state made public works progress payments to a contractor, which deposited them into its checking account at the bank. The bank then executed a setoff against the deposited progress payments to satisfy obligations of the contractor owning to the bank. The plaintiff bonding company sought to recover the monies from the bank on the basis that those monies were subject to a trust arising out of the public works contract between the contractor and the state. *Id.* at 331–32. The Sixth Circuit determined that the funds were subject to an express trust, and therefore could not be offset by the bank. National contends that the present case is controlled by *Fifth Third*, since the trust language in that case is practically identical to the trust language found in the bond agreement between National and debtor as well as the contract between Ohio and debtor.

In response to National's trust argument, the UCC asserts that the contract between Ohio and debtor was unsigned and thus cannot be accepted as evidence of a trust. The UCC also attempts to distinguish *Fifth Third* from our case. The *Fifth Third* court in part premised its ruling in favor of the bonding surety on the fact that the subcontractors possessed a cause of action against the trust funds under the contract between the surety and the State owner to which the surety could subrogate. *Fifth Third*, 867 F.2d at 333. The UCC contends that in the present proceeding, the monies which National asserts are subject to a trust are due and owing from Messer to debtor, rather than from the State owner to debtor, as was the case in *Fifth Third*. Finally, the UCC argues that *Fifth Third* was not a bankruptcy case, and the court therefore was not called upon, as we are here, to balance the Bankruptcy Code's policy of providing equal distribution to all creditors against the state's interest in ensuring that subcontractors are paid for their work on public projects.[4]

■ The question at hand is whether the trust provision in the bond agreement between debtor and National prevents the funds from being property of the estate. We hold that such a result would be contrary to the priority scheme set forth under state law and the Bankruptcy Code. Allowing the subcontractors to receive the funds directly merely by operation of trust provisions in construction contracts, in absence of a statute so requiring, *see, e.g.*, *Selby v. Ford Motor Co.*, 590 F.2d 642, 648 (6th Cir.1979), would effectively allow unsecured creditors unjustifiably to be paid even ahead of secured creditors. This result would also be contrary to requirements under the state mechanic's liens statutes, since subcontractors would not

---

4. The UCC also argues that the trust provision of the bond agreement between National and debtor should not be deemed to create a trust fund since the provision is a boilerplate indemnity agreement. The UCC argues that the case of *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110, 488 N.E.2d 189, 192 (1986), suggests that boilerplate language present in construction contracts should be disregarded. We reject this argument, since the court in *Cafferkey* merely held that a contractor could not be liable for personal injury claims asserted by employees of subcontractors based on a list of safety requirements provided by the contractor. *See id.* at 192. It would be improper to interpret this holding as a broad eradication of standard provisions in construction contracts and surety bonds.

need to concern themselves with filing proper liens so long as the surety had executed a trust agreement similar to the ones herein. *See* Marti & Goldstein, § 1–7 at 13 (while courts follow liberal construction regarding perfected lien, statutory procedures for perfecting liens require strict construction).

That the state's contract with debtor in the instant case has similar trust-creating language as the language applied by the *Fifth Third* court does not require an outcome favorable to National. In addition to the distinction that *Fifth Third* did not involve prioritizing claims within a bankruptcy context, a further material distinction between the two cases is that nowhere in *Fifth Third* does the Sixth Circuit refer to the priority status of the subcontractors apart from their status as trust beneficiaries. It is our conclusion that it would be unsound to apply *Fifth Third* in a context where the would-be beneficiaries are unsecured creditors. The appropriate recourse for National upon making payment on the bond for prepetition work done by the debtor's subs is the debtor's subs themselves. As it stands, National merely possesses a contingent, unliquidated claim against the estate, since it has not made any bond payments. When and if National pays the subcontractors, it will subrogate to their claims. *City of Greenfield*, 528 F.Supp. at 958–59.[5]

One final matter should be dealt with here. In an Addendum to its original motion for authorization of direct payment of the funds, National asserts that two of the three subcontractors whose claims are in question here, Carlisle Construction and TYS Construction, possess both prepetition and postpetition claims. National asserts that the postpetition portion of those funds are administrative expenses. We decline to rule on this question for it is not now before the court.

In light of the foregoing discussion, the motion of National American Insurance

Company for Order Authorizing Direct Payment to Subcontractors is denied.

---

5. In holding that National may not acquire greater rights through the operation of a trust than they would otherwise hold by way of subrogation to the unsecured status of the subcontractors, we need not address whether the sub-

mitted copy of the unsigned contract between the University of Cincinnati and debtor is evidence of the creation of a trust on behalf of the subcontractors as beneficiaries.