**CAPITOL INDEMNITY CORPORATION, Plaintiff–Appellee,**

v.

**UNITED STATES of America, Defendant–Third Party Plaintiff–Appellant,**

v.

**MT. VERNON TOWNSHIP HIGH SCHOOL DISTRICT 201, Third Party Defendant–Appellee.**

No. 93–3633.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1994.

Decided Nov. 30, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 23, 1995.

David M. Duree, Thomas J. Burnside (argued), Reinert, Duree & Crane, St. Louis, MO, for Capitol Indem. Corp.

Robert L. Simpkins, Asst. U.S. Atty., Crim. Div., Fairview Heights, IL, Gary R. Allen, David E. Carmack, Patricia M. Bowman (argued), David S. Newman, Richard J. Gagnon, Jr., Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for U.S.

David M. Duree, Bernard A. Reinert, Joseph M. Krutzsch, Thomas J. Burnside (argued), Reinert, Duree & Crane, St. Louis, MO, for Mt. Vernon Tp. High School Dist. 201.

David R. Hendrick, Hendrick, Spanos & Phillips, Atlanta, GA, Richard A. Stockenberg (argued), Donna Frazier, St. Louis, MO,

for American Subcontractors Ass'n, amicus curiae and American Subcontractors Ass'n, Midwest Council, amicus curiae.

Before CUMMINGS, FERGUSON,* and COFFEY, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal involves competing rights in a "progress payment" earned during the course of an ill-fated construction contract. The payment was designated for the general contractor, levied on by the Internal Revenue Service, and claimed by the completing surety for itself and a host of subcontractors. On cross-motions for summary judgment, the district court found that the funds belonged in part to the subcontractors and in part to the surety. The government has appealed this determination and we reverse.

## FACTS

In May 1991, Mt. Vernon Township High School District No. 201 (the "District") contracted (in the "Contract") with B & H Construction Company ("B & H") for asbestos removal and other work. B & H was to complete the project by August 9, 1991, in time for the new school year. The District agreed to a contract price of $248,340, due in monthly progress payments upon certification by the project architect that B & H had completed its work satisfactorily and paid its subcontractors and suppliers. The monthly payments would represent the work performed to date, less 10% "retainage" to be withheld until completion of the project and extinction of all liabilities to subcontractors, suppliers or other creditors. B & H agreed to obtain performance bonds and payment bonds for the protection of the subcontractors. The Contract further provided that "[n]either the Owner nor the Architect shall have any obligation to pay or to see to the payment of any moneys to any Subcontrac-

tors except as may otherwise be required by law." Contract article 9, section O.

B & H procured the necessary payment and performance bonds on May 31, 1991, from the surety, Capitol Indemnity Corporation ("CIC"), with whom it had a general indemnity agreement dating back to May 1989 (the "Agreement"). In the Agreement, B & H assigned all of its rights under future contracts to CIC; this assignment was subject to defeat if B & H did not default on its obligations.[1] Section 11 of the Agreement also purported to create a trust in the contract funds, "for the benefit of and for payment of all obligations for labor and material furnished in connection with such contract * * * for which the Surety would be liable under said bond or bonds" (Gov.Br.App. 39).

Work on the project commenced on June 4, 1991, followed almost immediately by problems: B & H fell behind schedule, and subcontractors began complaining about delayed or inadequate payments. The subcontractors did not then or at any other time file notices of liens pursuant to § 23 of Illinois' Mechanics Lien Act, 770 ILCS 60/0.01 et seq., which governs liens against public funds. The District modified the contract in an effort to ensure completion before school started but B & H was unable to make up lost time, and the August 9 deadline came and went with no end to the work in sight.

By early September, B & H had completed $143,993 of the work and had submitted its application for the second progress payment. Hovering over that sum (which, minus previously paid sums and agreed-upon retainage, totaled $102,341), however, was the long shadow of the Internal Revenue Service ("IRS"). In late July 1991, the IRS informed B & H of a federal tax obligation (unrelated to the District work) in the amount of $124,-448.51. B & H failed to pay this sum and on September 12, 1991, the IRS served a notice of levy on the District for all property owned

---

* The Honorable Warren J. Ferguson, United States Circuit Judge for the Ninth Circuit, is sitting by designation.

1. The Agreement stated in pertinent part:
 [B & H does] hereby assign, transfer and convey to the Surety, all of their right, title, interest and estate in and to all of their property, real, personal or mixed, wherever situated or

of whatever nature, in which [they] have, or may hereafter obtain, an interest including but not limited to [rights under the construction contract], such assignment to be effective as of the date hereof, subject to being defeated in the event there is no [breach] of the obligations contained in or covered by [this bond].

by B & H and in the District's possession. IRS officials instructed the District not to pay B & H any money owed it, but instead to send funds to the IRS.

The District's architect had forwarded B & H's application for the contested progress payment to his home office on September 9, 1991, with a recommendation that it be paid. After hearing about the IRS lien, however, District officials decided not to issue the funds to B & H. Although the District's architect formally certified the pay application on September 17, neither B & H nor the IRS was ever paid. On October 7 the District declared B & H in default, and on October 9 formally demanded that CIC perform on its bonds and complete the project.[2] CIC finished the job, paid the subcontractors, and received the withheld payment of $102,341 from the District in May 1992, along with the remainder of the Contract funds.

CIC subsequently filed suit against the government, challenging the levy as unlawful and claiming that B & H had no property interest in the $102,341 progress payment. CIC sought a declaration that its rights were superior to those of the United States, and an injunction against the United States from enforcing the levy. The government responded by counterclaiming that the progress payment was impressed with the lien, and also by filing a third-party counterclaim against the District for its failure to honor the levy.

The district court granted summary judgment against the government on both claims. The court held that the Illinois Mechanics Lien Act entitled the subcontractors to the portion of the progress payment that represented their work. Therefore, the court found that $85,921.70 was due the subcontractors and properly paid over to CIC on their behalf. As to the remaining $16,420, the district court held that the Agreement between CIC and B & H had transferred any remaining property right in the progress

payment to the surety on the date that CIC issued the payment and performance bonds. The court concluded that B & H had no property right in the progress payment, and that the government thus had nothing to levy against.

## DISCUSSION

 If B & H possessed the sole property interest in the progress payment at the time of the tax lien, the IRS was empowered to levy on those funds and would prevail in the absence of a prior lien. See *Avco Delta Corp. Canada Ltd. v. United States,* 484 F.2d 692 (7th Cir.1973), certiorari denied, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); 26 U.S.C. § 6321. State law governs the initial inquiry of whether the progress payment constituted property of B & H; federal law determines whether the state-created property right is one which a tax lien can reach. *Aquilino v. United States,* 363 U.S. 509, 512–514, 80 S.Ct. 1277, 1279–81, 4 L.Ed.2d 1365 (1960). If the progress payment was B & H's property to which a tax lien could attach, the focus shifts to examining lien priorities, which requires the application of federal law. *Id.* at 514, 80 S.Ct. at 1280–81.

### I. Property Rights

It is to these questions that we now turn, with the first step an examination of whether B & H or some other entity—namely the subcontractors, the District, or the surety—possessed a property interest in the progress payment at the time of the IRS lien.

### A. The subcontractors

 We begin by analyzing the subcontractors' interest.[3] CIC contends that Contract language stating that "Contractor shall pay each Subcontractor, upon receipt of payment from the Owner, an amount equal to the percentage of completion allowed to the Contractor on account of such Subcontrac-

---

**2.** B & H's owners filed for relief under Chapter 7 of the Bankruptcy Code on October 11, 1991; the corporation itself filed for Chapter 7 relief on October 30, 1991.

**3.** Although the subcontractors press no claim in this action, their rights are nonetheless impor-

tant: if they originally had a valid claim to the progress payment, the IRS' attempted lien on the entire sum was unlawful. Moreover, CIC as surety succeeded to any rights the subcontractors had under the theory of equitable subrogation.

tor's work" (Gov.Br.App. 74–75 ¶ J) created a trust for the benefit of the subcontractors in which B & H functioned as a "conduit" with only legal title to the funds. The above-quoted language manifests no intent to create a trust, however, but merely indicates that payment of the subcontractors was B & H's responsibility rather than the District's. The subcontractors' claim is further diminished by the fact that the Contract does not establish a discrete trust corpus. B & H was not required to pay the subcontractors out of specific funds or to turn over portions of the progress payment directly, but only to pay the subcontractors after the District paid B & H. See *La Throp v. Bell Federal Sav. and Loan Ass'n,* 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977) (lacking an "express provision in the contract indicating" that segregation of funds was contemplated, the court found no trust had been created), certiorari denied, 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1977); see also *In re Construction Alternatives,* 2 F.3d 670, 676–77 (6th Cir.1993) (segregation of funds critical to finding existence of trust). Section 11 of the Agreement, purporting to create a trust for the subcontractors and the surety in the Contract proceeds, is mere boilerplate, which Illinois courts generally view with suspicion. See, *e.g., G.H. Miller & Co. v. Hanes,* 566 F.Supp. 305, 308 (N.D.Ill.1983). While the "boilerplate" characterization is not dispositive, as we will see, section 11 conflicts with limitations on rights implicit in the Illinois Mechanics Lien Act. This fact also militates against imbuing the "trust" provision with much significance. See *In re Wm. Cargile Contractor, Inc.,* 151 B.R. 854, 859–60 (Bankr.S.D.Ohio 1993) (finding trust would be "contrary to requirements under the state mechanic's lien statutes, since subcontractors would not need to concern themselves with filing proper liens so long as the surety had executed a trust agreement similar to the ones herein"); see also *Construction Alternatives,* 2 F.3d at 676–77 (indemnity provi-

sion nearly identical to section 11 did not create express trust).

The Contract itself spells out the subcontractors' rights—more precisely, their lack of rights—in the progress payment. The relevant provision in the Contract, at article 9 section O, states that "[n]either the Owner nor the Architect shall have any obligation to pay or to see to the payment of any moneys to any Subcontractors except as may otherwise be required by law" (Gov.Br. 22). The first part of this directive dispenses with CIC's argument that the Contract explicitly contemplates giving rights in the progress payment to the subcontractors.

Thus CIC must rely on section O's final clause, which brings into play any state law that might offer the subcontractors additional recourse. See *DC Electronics, Inc. v. Employers Modern Life Co.,* 90 Ill.App.3d 342, 348, 45 Ill.Dec. 690, 413 N.E.2d 23 (1st Dist.1980) (under Illinois law, "statutory provisions applicable to a contract * * * are deemed to form a part of the contract and must be construed in connection therewith"), *cited in Western Waterproofing Co., Inc. v. Springfield Housing Authority,* 669 F.Supp. 901, 903 (C.D.Ill.1987). Relevant here is the section of the Illinois Mechanics Lien Act, 770 ILCS 60/23, regarding publicly funded works.[4]

The Act endows "[a]ny person who shall furnish material, apparatus, fixtures, machinery or labor to any contractor having a contract for public improvement for any * * * school district * * * in this State" with "a lien for the value thereof." 770 ILCS 60/23; see also *Chicago Bridge & Iron Co. v. Reliance Ins. Co.,* 105 Ill.App.2d 91, 99, 245 N.E.2d 127 (1st Dist.1969), reversed on other grounds, 46 Ill.2d 522, 264 N.E.2d 134 (1970). However, § 23 requires the would-be lienor to provide written notice to school officials and the general contractor in order to perfect the lien. 770 ILCS 60/23; *Wilbur Waggoner Equipment Rental & Excavating Co. v. Johnson,* 33 Ill.App.3d 358, 362, 342

---

4. The district court relied exclusively on a 1953 Illinois appellate case, *Robertson v. Huntley & Blazier Co.,* 351 Ill.App. 378, 115 N.E.2d 533 (4th Dist.1953), for its conclusion that the subcontractors had property rights in the progress payment

under Illinois law. That case involved private contracts and invoked a different section of the Mechanics Lien Act. *Robertson,* therefore, is inapposite to the resolution of this case.

N.E.2d 266 (5th Dist.1975). None of the subcontractors in the instant action complied with this procedural prerequisite; hence they forfeited their inchoate statutory lien. See *Board of Education of School Dist. No. 108 v. Collom,* 77 Ill.App.2d 479, 222 N.E.2d 804 (3rd Dist.1966) (failure to perfect lien according to § 23 places subcontractor in same position as other general creditors). For subcontractors performing work for public bodies, such as the District, adherence to the procedural dictates of § 23 is a necessary prerequisite to the attainment of rights in a progress payment.

CIC makes additional arguments concerning the subcontractors' alleged property rights in the progress payment, claiming that the subcontractors accrued rights under an equitable lien theory, as third-party beneficiaries or under an implied trust. All of these arguments are unavailing. Illinois case law recognizes subcontractors' equitable rights in construction contracts under the above theories in the context of disputes over retainage fees, which the *Avco Delta* court described as a sort of "liquidated damages clause." 484 F.2d at 701. Funds intended from the inception of a contract to settle potential claims differ vastly from progress payments, which belong to the free flow of commerce from the time they are properly paid over. See *Northwest Water Comm'n v. Carlo V. Santucci, Inc.,* 162 Ill.App.3d 877, 895, 114 Ill.Dec. 132, 516 N.E.2d 287 (1st Dist.1987) (distinguishing between retainage and amounts already paid over), appeal denied, 119 Ill.2d 559, 119 Ill.Dec. 388, 522 N.E.2d 1247 (1988); see also *International Fidelity Ins. Co. v. United States,* 949 F.2d 1042, 1046 (8th Cir.1991). We are therefore unpersuaded by the rationales advanced in the case law presented by CIC. By failing to adhere to the Mechanics Lien Act, the subcontractors in this case lost their priority interest in the progress payment, and cannot be said to have any property right in that sum.

## B. The Surety

■ But what about CIC? As the surety, CIC ostensibly succeeded to all of B & H's rights under the Contract through the Agreement, which assigned these rights when the payment and performance bonds were issued. If this assignment were effective as written, then at the time of the IRS lien the progress payment would have belonged to CIC, not B & H.

The "assignment," however, simply granted CIC an unperfected security interest in the Contract proceeds until the time B & H actually defaulted and CIC had to perform on the bonds. See *United States v. R.F. Ball Construction Co.,* 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958) (similar assignment created "inchoate and unperfected" security interest). In this case, the Agreement itself was ambiguous in its attempt to create an effective assignment of rights: as noted above, the boilerplate language in section 11 purported to create a trust in future contract earnings for the benefit of the surety and the subcontractors. Had the "assignment" in the Agreement been effective before default, the "trust" provision would have made no sense. Section 11's attempted trust is inconsistent with and thus renders additionally implausible B & H's ostensible assignment of all of its rights under the Contract to CIC, dating back to the time the bonds were issued. Prior to default, then, B & H and not CIC had rights in all monies already paid over. See *Fidelity & Deposit Co. of Md. v. Scott Bros. Const. Co.,* 461 F.2d 640, 643 (5th Cir.1972) ("Any payments made by the owner prior to default * * * are attributable to the contractor's performance, not the surety's.").

For purposes of analyzing CIC's direct interest, the question becomes one of timing: did B & H default before or after the IRS invoked its tax lien?[5] Although the district court reserved judgment on this issue, the

5. This question also affects any rights claimed by the District. Upon a valid declaration of default, the District could legitimately have withheld unpaid Contract funds in order to finish the project. See *Gunther v. O'Brien Bros. Const. Co.,* 369 Ill. 362, 364, 16 N.E.2d 890 (1938) (upon a contractor's default prior to the completion of the work, a public body may use withheld funds to complete the job), *cited in Santucci,* 162 Ill.App.3d at 894–895, 114 Ill.Dec. 132, 516 N.E.2d 287. By waiving its right to declare default until after it had certified the progress payment, however, the District forfeited its claim in the funds.

record seems clear as a matter of law that only on October 7, 1991, did the District terminate B & H's ability to perform on the Contract, and only on October 9 was CIC required to perform any of the duties inherent in its role as surety. While CIC now contends that B & H's concededly inadequate performance from day one constituted default, both the surety and the District appear to have anticipated that B & H would complete the project (albeit behind schedule) up until the day the IRS notified school officials of the pending lien. Indeed, the District made substantial efforts through September to ensure that B & H stayed on the project, frequently modifying the Contract through written change orders that reduced or altered work specifications and amounts owed to B & H. The District's actions served to waive their early opportunities to declare B & H in default under the Contract, and by extension to postpone CIC's accrual of rights.

As for the surety, CIC could not, upon hearing of B & H's performance problems or liquidity concerns, have forced the District to declare a default. See *United States v. Continental Cas. Co.*, 346 F.Supp. 1239 (N.D.Ill. 1972) (federal government could waive technical default of contractor despite warnings from surety; fact that surety's subrogation rights were impaired was less important than government's interest in completing the job efficiently). As *Continental Casualty* makes clear, the District was entitled to exercise discretion in deciding when to terminate B & H's performance; the fact that in doing so it curtailed CIC's rights is immaterial.

The conclusion that B & H did not default until after the IRS issued its lien disposes of CIC's direct rights as assignee as well as its right of equitable subrogation in other valid claims. As completing surety, CIC was subrogated to the rights of several parties: the original contractor, the subcontractors and suppliers, and the owner (here the District) for whom the job was completed. See *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 845 (1st Cir.1969) (surety assumes rights of numerous parties on contractor's default). The right of subrogation, which entitled CIC to "step into the shoes" of any party whose obligations it

assumed, would not take effect until CIC actually assumed these obligations. See *American Cas. Co. of Reading, Pa. v. Line Materials Industries*, 332 F.2d 393 (10th Cir. 1964) (noting "clear distinction" between right of subrogation, which exists from date bond is executed, and actual subrogation, which occurs only when payments are made on contractor's default), certiorari denied, 379 U.S. 960, 85 S.Ct. 646, 13 L.Ed.2d 555 (1965).

By the time CIC could assert its right of subrogation, no claims remained for the surety to be subrogated to: the subcontractors had lost their potential interest by failing to file notices of lien, B & H had had its property subjected to the IRS lien, and the District had neglected to take the opportunity to declare B & H in default and to withhold the progress payment on that basis. CIC's claim of subrogation rights, like its claim to a direct interest in the progress payment, thus fails.

## II. Competing Lien Priorities

■ Having rejected CIC's contention that B & H did not have a property interest in the progress payment attachable by a federal lien, we must now determine whether CIC has a superior claim as completing surety. This answer is somewhat more straightforward: they do not. With respect to lien priorities, the well-known rubric that "first in time is the first in right" applies in this case. *United States by and through I.R.S. v. McDermott*, —— U.S. ——, ——, 113 S.Ct. 1526, 1528, 123 L.Ed.2d 128 (1993), quoting *United States v. City of New Britain*, 347 U.S. 81, 87, 74 S.Ct. 367, 371, 98 L.Ed. 520 (1954). CIC could not prime its state-created surety's lien until B & H defaulted and when there was "nothing more to be done * * *—when the identity of the lienor, the property subject to the lien, and the amount of the lien [were] established." *City of New Britain*, 347 U.S. at 84, 74 S.Ct. at 371. In this case, CIC did not step in and begin performing work and making payments on the project—prerequisites to priming its surety's lien—until October 9, 1991, well after the tax lien was in place.

CIC was also not entitled to prevail under the "super-priority" exception set forth in the Internal Revenue Code to give priority to certain inchoate claims. 26 U.S.C. § 6323(c). That statute provides in pertinent part that:

> (1) * * * To the extent provided in this section, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—
>
>> (A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—
>> * * * (iii) an obligatory disbursement agreement, and
>> (B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

*Id.* Although CIC's inchoate lien met the statutory definition of an "obligatory disbursement agreement," the surety's claim was not perfected, and thus not protected under local law against a judgment lien. See 810 ILCS 5/9–302 (Illinois law requires sureties to file financing statement in appropriate office in order to perfect claim). Accordingly, with no protection against a judgment creditor, CIC has none against the federal tax lien under the super-priority structure. See *Construction Alternatives,* 2 F.3d at 678.

### CONCLUSION

In attempting to persuade this Court that the court below decided correctly, CIC reserves its most impassioned rhetoric for arguments regarding the rights of subcontractors to the fruits of their labor. Yet the subcontractors had available the shelter of the Illinois Mechanics Lien Act (which they forfeited) and the protection of the payment bond supplied by CIC (which resulted in their full payment). The party with a quantifiable monetary stake in this action was CIC, which is in the business of taking risks and appears to have bet on the wrong horse. Finding that CIC's claims are without merit and that B & H did in fact possess a property right in the progress payment which the IRS properly attached, we reverse the judgment of the district court and remand for further proceedings consistent with this ruling.